**UNITED STATES of America, Plaintiff-Appellee,**

v.

**FOX LAKE STATE BANK, Appellant, and Donald Adams, Defendants.**

**Nos. 15340, 15341.**

United States Court of Appeals Seventh Circuit.

Aug. 22, 1966.

Kiley, Circuit Judge, dissented in part.

John B. Huck, Chicago, Ill., for appellants.

Alan S. Rosenthal, Asst. Atty. Gen., James C. Gaither, Atty., Dept. of Justice, Washington, D. C., Edward V. Hanrahan, U. S. Atty., Thomas W. James, Asst. U. S. Atty., Chicago, Ill., John W. Douglas, Asst. Atty. Gen., for appellee.

Before DUFFY, Senior Circuit Judge, and KNOCH and KILEY, Circuit Judges.

KNOCH, Circuit Judge.

The United States of America, plaintiff-appellee, brought this action under the Civil False Claims Act (Title 31, U.S.C. § 231) with respect to twenty-one defaulted Federal Housing Administration (hereinafter called "FHA") Title I loans on which claims for insurance were filed with the FHA by defendant-appellant, Fox Lake State Bank (hereinafter called the "Bank".)

The plaintiff sought forfeitures of $42,000 and double damages of $5,335.20 for payment of one claim in the amount of $2,667.80. The District Judge, sitting without a jury, granted judgment for plaintiff in the amount of $47,335.20, and denied the defendants' counterclaim for a judgment declaring the twenty-one loans in question and some fifteen other similar loans eligible for FHA insurance. This appeal followed. Co-defendant Donald Adams, an employee of the Bank, against whom default judgment was entered, did not appeal.

Under the National Housing Act (Title 12, U.S.C. § 1701 et seq.) the Commissioner of the FHA may insure financial institutions against losses sustained through advances of credit to finance repairs and improvements to realty by owners or lessees. Regulations implementing the Act require that the proceeds of these loans be used only to finance such repairs or improvements; that the insured institutions make no loan without first obtaining a credit application and other data showing the borrower to be solvent and a reasonable credit risk; that, if after making the loan in good faith, an insured discovers material misstatements or misuse of proceeds, these be promptly reported to the Commissioner, but that the insurance eligibility will not thereby be affected.

The facts in this case are largely uncontested and the subject of stipulations.

In September 1958, the Bank engaged Donald Adams to take charge of its FHA loan department. He interviewed applicants and investigated their credit. On the basis of his recommendations, a Bank officer would approve loans and sign cashier's checks for the proceeds. Adams would prepare the loan documents and deliver the checks to the borrowers. It is agreed that the Bank's policy was to make these loans to homeowners only and not to construction companies. The Bank's executive vice-president Sam Bass testified that he so instructed Adams repeatedly.

Late in the Fall of 1958, Adams entered into an agreement with one Berthold Goodman and one James Rogers to cause the Bank to make loans to customers of their company, Bradley Construction Company (hereinafter called "Bradley") in return for cash payments of $200 to Adams from the proceeds of each such loan. By April 1959, Adams had approved credit applications at $200 each for about thirty-six customers of Bradley, each of whom signed a home improvement contract with the understanding that he would obtain a loan on the basis of an inflated contract price. The difference between the actual cost of any improvements and the amount of the loan was to be used to pay other debts of the borrower. Each Bradley customer signed applications containing the false information. Some borrowers signed

false completion certificates. All the borrowers endorsed their loan checks to Goodman and Rogers who gave them cash to pay their other debts. As complaints about FHA loans were referred to Adams, the fraud continued undiscovered for many months. By August 25, 1959, however, the Bank and the FHA by individually secured and shared information were both aware of the misstatements in applications and the misuse of the loan proceeds. By February 1960, the Bank's officers learned of the $200 bribes received by Adams for about thirty-four of the loans.

The Department of Financial Institutions of the State of Illinois (hereinafter called the "Department") and the Federal Deposit Insurance Corporation (hereinafter called the "FDIC") jointly examined the Bank. Their investigation showed a serious capital impairment as a result of bad loans which the Bank was to correct immediately or suffer liquidation.

Both the Department and the FDIC demanded that the Bank ascertain whether FHA insurance was collectible so that the Department could determine the amount of new capital needed.

From time to time representatives of the Bank, of the Department, and of the FDIC asked representatives of the FHA whether insurance would be paid on these loans, explaining the urgent necessity for securing that information. The only answer given in each instance was that the Bank must file formal claims on each loan and the FHA would then and only then rule on each individual loan.

The Bank filed its first formal claim on September 16, 1959, in connection with the Audette loan. January 6, 1960, the FHA wrote the Bank advising that the Audette claim was denied. However on request for reconsideration, this denial was withdrawn. Determination was delayed and in July 1960, the Bank's attorney was advised that the Federal Bureau of Investigation was still investigating the matter and that so long as their investigation was pending, the FHA would not be in a position to act on the insurance claims. There was testimony that repeated oral advice was given to the same effect in response to all inquiries.

In addition to the pressures from the Department and the FDIC to secure a ruling from the FHA, the Bank was also concerned lest these delays prejudice its rights under the bond insuring the Bank against losses incurred through the dishonesty of Adams. As no final decision on the Audette claim was forthcoming, the Bank filed claims on another twenty of the loans, explaining in a letter that these claims were filed to avoid laches on the bond. The FHA wrote on October 7, 1960, to advise the Bank's attorney that the claims were being held in abeyance pending completion of the Federal Bureau's investigation.

The Bank's attorney testified that there was only one employee at the Bank who knew the FHA claim procedures and that she was shortly to leave the Bank's employ. He stated that he left the preparation of these claims entirely to this employee as neither he nor the vice-president of the Bank who signed the claim forms was familiar with the procedures. He added that he was primarily concerned with prompt filing before this employee left and to avoid laches on the Adams bond, having delayed filing as long as possible, and only to secure the necessary determination of eligibility in compliance with the orders of the Department and the FDIC. He added that he did not even read the completed claim forms as he would not have known whether or not they were correctly filled out, knowing, as he did, that the FHA was at least as well informed of the pertinent facts as the Bank's officials.

The claims, as made up for Assistant Vice-President Emory Wheelock's signature, included the following statement:

The undersigned hereby applies for such amount as is due under its contract and the Regulations of the Federal Housing Commissioner issued in accordance with Title I of the National Housing Act, and certifies that the terms of said contract and of said

Regulations have been complied with, that the following information is correct, that the application for insured loss is just, and that payment therefor has not been received.

The space provided in the form for "Remarks (explain any inaccuracies or omissions found in the examination of the required documents)" contained no reference to the irregularities noted above.

All of the Bank's FHA loans had been placed in suspense, as the Bank was advised by letter in July 1959, and as the FHA claim examiners, claims reviewers and voucher unit were notified by addition of the Bank's name to a stop-payment list. All but one of the claims were accordingly sent by the FHA claims examination unit to the FHA operations section for review just as they would have been if the Bank had attached a full resume of the facts known to the Bank and to the FHA. One claim, the Booth claim, was paid.

The Bank's officials were then and apparently still are of the opinion that the loans ought to be held eligible for FHA insurance under § 201.5 of the FHA regulations which provide that a loan will be insured if the lender acted in good faith, found no misstatements or misuse of the funds till after disbursal and promptly reported its discovery to the Commissioner. The Bank takes the position that Adams had a fraudulent adverse interest to the Bank and that his knowledge cannot be imputed to the Bank, and, further, that full information was in the hands of the Commissioner before the Bank knew all the details.

The government asserts that § 201.5 protects the Bank from misstatements or misuse of proceeds "by the borrower, dealer, or others" and that "others" cannot include the Bank's own officers and employees. In addition, the government contends that the Bank did not promptly notify the FHA when, late in March 1959, one borrower, Bennett, informed the Bank officials that he had not listed all of his debts. He did not, however, indicate misuse of the funds. The Bank did discuss this loan with representatives of the Federal Bureau of Investigation early in April, 1959, less than a month later.

The District Court found that the Bank presented for payment claims known to be false, that an intent to defraud was not required in this case under the Statute which imposes liability for presentation of a claim known to be false, fictitious *or* fraudulent.

We do not hold that the loans were eligible for FHA insurance, but we are of the opinion that the record before us does not support a conclusion that knowingly false claims were presented or that these claims were not submitted primarily to acquire a much needed determination which was available, on repeated instructions from FHA officials, only on the filing of claims such as these. With the exception of the Booth claim [1] the claims were processed by the FHA as requests for a ruling. It was evident that both the FDIC and the Department were also uncertain about the eligibility of the loans.

Nor do we see an analogy, as the government argues, to a suit filed in Court. To impose the severe penalty here sought against the Bank for failure to include in the claims the full details of the loans is to ignore the long history of correspondence and conferences between the Bank and FHA employees from which the Bank rightly assumed that the FHA was in full possession of all the facts. Representatives of the FHA who did know all the facts had told the Bank to file claims to secure the needed ruling, and the Bank did file claims, albeit ineptly drawn claims submitted hastily without expert checking.

■ We agree that the doctrine of estoppel must be applied with great caution to the government and its officials. But in proper circumstances the doctrine does apply. Vestal v. C.I.R., 80 U.S.App.

---

1. The record does not make it clear whether the Booth claim was paid through inadvertence or not.

D.C. 264, 1945, 152 F.2d 132, 135–136; Semaan v. Mumford, 1964, 118 U.S.App. D.C. 282, 335 F.2d 704, 706; U. S. v. Stinson, 7 Cir., 1903, 125 F. 907; U. S. v. Denver & R.G.W.R. Co., 8 Cir., 1926, 16 F.2d 374, 376; Eichelberger & Co. v. C.I.R., 5 Cir., 1937, 88 F.2d 874, 875.

■ Under the peculiar circumstances of this particular case, the plaintiff, in our opinion, is estopped to bring this action against the Bank. That part of the judgment in the District Court providing for recovery of double damages on the Booth claim and for statutory forfeitures on all twenty-one claims is reversed. The judgment is in all other respects affirmed.

The motion of the plaintiff-appellee to dismiss the instant appeal is hereby denied.

Affirmed in part; reversed in part.

KILEY, Circuit Judge (dissenting in part).

The majority opinion leaves untouched the district court's decision against the Bank on its counterclaim seeking a declaration that the loans were eligible for insurance. I agree with that part of the majority opinion. The basis of the district court's decision in that part of the case is that the Bank, through Adams, knew when the loans were made of the misstatements in the applications and of the misuse of the loan proceeds. In its opinion the district court expressed the view that loans made in bad faith by the Bank through Adams could not "logically" be eligible for insurance.

I dissent from that part of the majority opinion which reverses the judgment for the United States under the False Claims Act, 31 U.S.C. § 231 (1964).

The district court in an earlier decision denied the Bank's motion for summary judgment dismissing the government's suit. United States v. Fox Lake State Bank, 225 F. Supp. 723 (N.D. Ill. 1963). It there held that intent to defraud was not an essential element of the government's case under the first two clauses of section 231. See 225 F. Supp. at 725. In the decision before us the district court adhered to that holding, which the Bank challenges. The decisions on the question are not uniform.[1]

In my view it is unnecessary to decide the question because the record supports judgment for the government under either rule.

There is no evidence that the FHA advised the filing of false claims, or that the claims would not be treated as claims for payment, or that the claims were processed merely as requests for rulings; there is no limitation to that effect in the claims or in letters accompanying the claims and there is evidence of the acceptance by the Bank of the payment by the FHA of the Booth claim, and that what knowledge the FHA had of the misconduct in connection with the loans did not safeguard the government from loss in the Booth claim.

In view of these considerations the district court was not compelled to find that the Bank, out of a reasonable belief that the loans qualified for insurance, filed them in good faith only for the purpose of a ruling, and not for payment.

The purpose of the False Claims Act—to protect the government against possible cheating by claimants who knowingly filed false claims for payment—justifies what might otherwise be a harsh judgment. Moreover, the Bank received $52,-500.00 in settlement of its suit against Adams' surety on the basis of Adams' misconduct.

1. *E.g.*, compare Fleming v. United States, 336 F.2d 475, 479 (10th Cir. 1964), cert. denied, 380 U.S. 907, 85 S.Ct. 889, 13 L. Ed.2d 795 (1965), and Acme Process Equipment Co. v. United States, 347 F.2d 509, 527 n.26 (Ct. Cl. 1965), with United States v. National Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956), cert. denied, 353 U.S. 930, 77 S. Ct. 719, 1 L. Ed.2d 724 (1957), and United States v. Park Motors, 107 F. Supp. 168, 175 (E.D. Tenn. 1952).