Michele PORTMANN, doing business as Grafica, an individual, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 81–1390.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1981.
Decided March 24, 1982.
Rehearing and Rehearing En Banc Denied July 22, 1982.

Andrew W. Brainerd, Brainerd & Bridges, Chicago, Ill., for plaintiff-appellant.

Robert B. Breisblatt, Asst. U. S. Atty., Dan K. Webb, U. S. Atty., Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and CAMPBELL, Senior District Judge.*

CUDAHY, Circuit Judge.

The primary issue in this appeal is whether the doctrine of equitable estoppel may be invoked against the United States Postal Service on the basis of representations made by a postal employee to a potential "Express Mail" customer. The district court, on cross motions for summary judgment, held that estoppel was unavailable against the federal government as a matter of law, and granted summary judgment in favor of the Postal Service on that basis. We reverse and remand for further proceedings.

I.

On January 15, 1980, plaintiff-appellant Michele Portmann, a free lance graphic arts designer, paid the United States Postal Service thirty-one dollars to transport three small packages containing color film separations, taken from photographs of the works of Salvador Dali, from Highland Park, Illinois, to New York City. Portmann alleges that at the time of the mailing, she stated to the Postal Service that her packages contained color separation film of great value, which could not easily be reproduced, and that safe insured carriage was therefore imperative. Portmann further alleges that the postal clerk on duty assured her that by paying $31 for "Express Mail" and special "Document Reconstruction Insurance," Portmann could guarantee that her packages would be "fully insured against loss up to $50,000." Verified Complaint at

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

¶ 5.[1] Relying on this representation, Portmann paid the required "Express Mail" fee and designated the value of package # 1 as $1,000, package # 2 as $2,000 and package # 3 as $3,000.

Package # 3 was never delivered. Upon discovering the loss, Portmann promptly filed an application for indemnity with the Postal Service. In her application, Portmann claimed indemnity for the package in the amount of $3,874, a sum which she claimed represented the cost of reconstructing the lost film. The Postal Service reviewed Portmann's application and determined that the film was "merchandise" as distinguished from "nonnegotiable documents" under the applicable postal regulations, and that Postal Service liability was therefore limited to $500.[2] After unsuccessfully pursuing an administrative appeal, Portmann filed the instant suit in federal district court seeking damages of $7,500.[3]

On October 10, 1980, Portmann filed a Motion for Summary Judgment in the district court, then verifying the contents of her complaint under oath. In her motion, Portmann argued *first*, that the film separations constituted "documents" rather than "merchandise" under a proper interpretation of the applicable postal regulations, and *second* that Portmann's reliance on the postal clerk's oral assurances that her packages would be insured up to $50,000 should preclude the government from now limiting coverage to $500, regardless of the actual provisions of the postal regulations. The Government responded with its own Motion for Summary Judgment on November 3, 1980, arguing that Portmann's film separations had been correctly characteriz-ed by the Postal Service as "merchandise" rather than nonnegotiable documents and that coverage was therefore limited to $500. In addition, although not expressly admitting the factual allegations upon which Portmann's estoppel claim was based, the Government argued that such allegations, even if true, would not entitle Portmann to relief since " 'estoppel cannot be set up against the Government on the basis of an unauthorized representation of an officer or employee . . . .' " Defendant's Motion for Summary Judgment at 2, *quoting Abbott v. Harris*, 610 F.2d 563, 564 (8th Cir. 1979).

The district court found for the Government on both issues. First, it confirmed the Postal Service's determination that Portmann's film separations were merchandise, subject to an indemnity limit of $500, rather than nonnegotiable documents, eligible for "Document Reconstruction Insurance" of up to $50,000. Second, the district court determined, as a matter of law, that the Postal Service could not be bound by the erroneous representation of a postal employee. Noting that it was "not without appreciation of the fact that plaintiff may have relied, to her detriment, on the representations of a Postal Service employee," the district court concluded that

> . . . the facts that plaintiff reasonably believed her package to be covered by document reconstruction insurance and that recovery could presumably be had against a private company in these circumstances, unfortunately are irrelevant. . . . The Postal Service regulations define the parameters of package insurance and cannot be changed by a misun-

---

**1.** The Government in its Answer, stated that it was "without knowledge or information sufficient to form a belief as to the truth of [these] averments." Defendant, however, has submitted no affidavits or other evidence to refute plaintiff's version of the facts. We therefore accept plaintiff's allegations as true for purposes of this appeal.

**2.** Section 294.1 of the Domestic Mail Manual states that "Express Mail is insured against loss, damage, or rifling at no additional cost." Section 294.2 of that Manual, which is entitled "Document Reconstruction Insurance," pro-vides that nonnegotiable documents are insured against loss, damage or delay while in transit for up to $50,000 per piece. Section 294.3 of the Manual, entitled "Merchandise Insurance" provides: "Parcels are insured against loss or damage; coverage is limited to $500."

**3.** Portmann alleged jurisdiction under 28 U.S.C. § 1339 (1976) (civil actions relating to postal matters); 28 U.S.C. § 1346 (1976) (United States as a defendant); and 39 U.S.C. § 409 (1976) (suits by and against the Postal Service).

derstanding on plaintiff's part, however induced.

Dist.Ct.Op. at 4. This appeal followed.

## II.

■ At the outset, we reject Portmann's contention that the contents of package # 3 qualified as "nonnegotiable documents" within the meaning of the applicable Postal Service regulations. Section 294.21 of the Domestic Mail Manual provides that "nonnegotiable documents" sent by Express Mail "are insured against loss, damage, or delay while in transit," for up to $50,000 per mailing unit.[4] Section 294.22 of that Manual states that nonnegotiable documents "include commercial papers, documents, and such written instruments as are used in the conduct and operation of banks and banking institutions that have not been made negotiable or which cannot be negotiated or converted into cash by unauthorized persons without resort to forgery." Nonnegotiable documents also include "valuable records, audit media, and other business records." Such records "may be in conventional hard copy form, data processing cards, tapes, film, microfilm, or other forms of data storage." Domestic Mail Manual § 294.22.

Portmann argues that her color separations should be treated as nonnegotiable documents because they are film and because they have no intrinsic value apart from their message-carrying capacity. This argument, however, misconstrues the import of the word "film" in Section 294.22. Film, in the context of the Domestic Mail Manual, refers only to the medium upon which a business record or other commercial data is carried. It does not purport to classify as nonnegotiable documents all photographic reproductions or transparencies. Plaintiff's film separations, although both "reproductive" and "information carrying," are not valuable solely as a means by which commercial information is carried. We thus agree with the district court's conclusion that "[p]laintiff's goods, while in film form and certainly valuable, do not fit within the limited definition given to nonnegotiable documents [in the Domestic Mail Manual]." Dist.Ct.Op. at 3.

We believe, however, that this conclusion involves a fairly technical question of regulatory interpretation, and that a layperson reading these regulations as they existed as of January, 1980, might reasonably conclude that film separations such as Ms. Portmann's were eligible for Document Reconstruction Insurance.[5] Although we reject this interpretation as legally incorrect, we consider its plausibility relevant to our analysis of plaintiff's estoppel claim. *See* Section IV *infra.*

## III.

■ The doctrine of equitable estoppel precludes a litigant from asserting a claim or defense which might otherwise be available to him against another party who has detrimentally altered her position in reliance on the former's misrepresentation or failure to disclose some material fact. *See* 3 J. Pomeroy, Equity Jurisprudence § 804 at 189 (5th ed. 1941); Note, *Equitable Estoppel of the Government*, 47 Brooklyn L.Rev. 423, 424 (1981). In the United States, the traditional view has been that equitable estoppel will not lie against the

---

4. Domestic Mail Manual, § 294.21. The Domestic Mail Manual is incorporated by reference in the Code of Federal Regulations, 39 C.F.R. § 111.1 (1980), and is thus part of the regulations of the United States Postal Service.

5. On November 6, 1980, the Postal Service made the following changes in Section 294.22 of the Domestic Mail Manual:

   Section 294.22. Delete the word film from the last sentence. Add the following sentence at the end of 294.22: "Articles such as artwork, readers proofs, repro proofs, sepa-

ration negatives, engineering drawings, blue prints, circulars, advertisements, film, negatives, photographs, etc. are considered merchandise, not documents, and claims for them are processed in accordance with the regulations for Express Mail Merchandise Insurance (see 294.3)."

According to the Postal Bulletin, these changes were issued "to clarify insurance coverage and improve customer understanding and administration of insurance claims." *See* Government's Brief at 6 n.5.

Government or any of its agencies.[6] Originally, this view rested largely on considerations of sovereign immunity. *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 99 (9th Cir. 1970). Once it was conceded that the government could not be held liable for the wrongful acts of its agents, it followed, as a logical corollary, that the government could not be estopped by the misrepresentations or material omissions of its employees.[7]

As the doctrine of sovereign immunity eroded, it became necessary to offer other justifications for the government's exemption from equitable estoppel. One such justification invoked a separation of powers rationale; proponents argued that permitting equitable estoppel against the government would, in effect, allow government employees to "legislate" by misinterpreting or ignoring an applicable statute or regulation. Judicial validation of such unauthorized "legislation," it was claimed, would infringe upon Congress' exclusive constitutional authority to make law.[8] Although this rationale has some logical appeal, applied literally and generally, it would seem to preclude *any* application of estoppel against the government including its use in areas such as government procurement con-

tracts and legal proceedings—areas in which the government has long been held subject to estoppel principles.[9] Moreover, such a rigid separation of powers analysis contrasts sharply with the more realistic and flexible judicial approach to separation of powers problems in other areas such as legislative delegation. In any event, reliance on a separation of powers rationale to preclude estoppel against the government is considerably less persuasive where only an agency's own regulations are at stake than it would be where adherence to government misinformation threatens to contravene an explicit statutory requirement. *See* Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551, 565–66 (1979). *Cf. Gressley v. Califano*, 609 F.2d 1265 (7th Cir. 1979).

In addition to invoking a separation of powers rationale, some courts and commentators have relied on public policy considerations to support the no-estoppel rule, drawing in particular on several early Supreme Court opinions in which the Court expressed concern that holding the government bound by the improper acts of its agents might promote fraud and collusion,

---

**6.** 2 K. Davis, Administrative Law Treatise § 17.01 at 491–92 (1958). *See, e.g., Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917).

**7.** As Professor Davis has noted:
Sovereign immunity from contract and tort liability naturally carried with it sovereign immunity from equitable estoppel. A Supreme Court which was freely asserting that "The government is not responsible for ... the wrongful acts of its officers," could hardly assert that the government was estopped on account of representations by its officers. 2 K. Davis, *supra* note 6, § 17.01 at 492 (quoting *Hart v. United States*, 95 U.S. 316, 318, 24 L.Ed. 479 (1877)).

**8.** Pursuant to this rationale, many courts have explained their refusal to allow estoppel against the government by underscoring "the duty of all courts to observe the conditions defined by Congress for charging the public treasury," *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), and by emphasizing the need to prevent the frustration of federal statutes. *See, e.g., Schweiker v. Hansen*, 450 U.S. 785,

101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *Goldberg v. Weinberger*, 546 F.2d 477 (2d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977).

**9.** *See, e.g., Russell Corp. v. United States*, 537 F.2d 474, 484 (Ct.Cl.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977) (doctrine of equitable estoppel will be applied, in appropriate case, to prevent United States from denying existence of a contractual agreement); *Roberts v. United States*, 357 F.2d 938, 946–47 (Ct.Cl.1966) ("When the Government is acting in its proprietary capacity, it may be estopped by an act of waiver in the same manner as a private contractor."); *United States v. Coast Wineries*, 131 F.2d 643, 650 (9th Cir. 1942) (inability of judicial participants to rely on statements and stipulations of government counsel would produce "delay and confusion which would be seriously detrimental to the orderly administration of justice"); K. Davis, Administrative Law Text § 17.03 at 348 (1972) ("The government is estopped every hour by agreements, stipulations, concessions, failures to object, and representations made by government attorneys.").

or lead to the severe depletion of the public treasury at the hands of a few enterprising individuals.[10] Critics of this "traditional" view, however, have pointed out that the incidence of "improper collusions" has historically been exceedingly small and that large sums of money are not often at stake in estoppel cases.[11] Finally, some courts and commentators have argued that allowing estoppel against the government might interfere with agency flexibility in changing rules and implementing new policies.[12] More modern decisions, however, have discredited this rationale, and have noted that a concern for administrative efficiency should not permit the government to deal unfairly or capriciously with its citizens. *See, e.g., United States v. Georgia-Pacific Co.*, 421 F.2d 92, 100 (9th Cir. 1970); *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657 (Ct.Cl.1973) (per curiam); *Massag-*

*lia v. Commissioner of Internal Revenue*, 286 F.2d 258, 260 (10th Cir. 1961).

With the growth of the federal government and the broadening of government interaction with private parties, many courts have reconsidered their reluctance to apply the doctrine of equitable estoppel against the government.[13] One widely applied judicial technique for limiting the no-estoppel rule posits a distinction between the "sovereign" (or governmental) and the "proprietary" (or nongovernmental) functions of federal agencies.[14] Under this approach, activities by the government undertaken primarily for the commercial benefit of the government or an individual government agency are subject to estoppel while actions involving the exercise of exclusively governmental or sovereign powers are not.[15] The sovereign/proprietary distinction has proven to be particularly useful in cases involving government contracts. With re-

---

**10.** *See, e.g., Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *Lee v. Munroe*, 11 U.S. (7 Cranch) 366, 369, 3 L.Ed. 373 (1813). *See generally* Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551, 554 (1979).

**11.** *See* Berger, *Estoppel Against the Government*, 21 U.Chi.L.Rev. 680, 684 (1954); Note, *Santiago v. Immigration and Naturalization Service—The Ninth Circuit Retreats from its Modern Approach to Estoppel Against the Government*, 1976 Utah L.Rev. 371, 373 n.10. Moreover, to the extent that a deterrent against public fraud is required, it is supplied by the severe criminal sanctions imposed for defrauding the government. *See, e.g.*, 18 U.S.C. § 1001 (1976).

**12.** *See e.g., Automobile Club v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); Comment, *Never Trust a Bureaucrat: Estoppel Against the Government*, 42 S.Cal.L. Rev. 391, 398 (1969). In response to this argument, it has been noted that if the public is given sufficient notice of changes in agency rules and policies, no estoppel could be based on adherence to an old rule, since no justifiable reliance could be shown. *See NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 859 (2d Cir. 1966).

**13.** As Professor Davis has stated:
The law has changed.... The doctrine of equitable estoppel does [now] apply to the government. Of course, the problem remains of determining when estoppel is "equitable" and when it is not, and the government for

that purpose is sometimes affected by special considerations.

K. Davis, Administrative Law of the Seventies, § 1701 at 399 (1976).

**14.** *See, e.g., United States v. Georgia-Pacific Co.*, 421 F.2d 92, 100–01 & n.17 (9th Cir. 1970); *Branch Banking & Trust Co. v. United States*, 98 F.Supp. 757 (Ct.Cl.1951), *cert. denied*, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951). *See generally*, Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551, 555-57 (1979).

**15.** Characteristic "sovereign" activities traditionally not subject to estoppel include criminal prosecutions, *see United States v. Mattucci*, 502 F.2d 883 (6th Cir. 1974); interpretation of tax statutes, *see Automobile Club v. Commissioner*, 353 U.S. 180, 183-84, 77 S.Ct. 707, 709-10, 1 L.Ed.2d 746 (1957); and enforcement of health and safety regulations, *see Pacific Shrimp Co. v. United States Dept. of Transportation*, 375 F.Supp. 1036, 1042 (W.D.Wash. 1974). In addition, government actions with respect to federal property and Indian lands held in trust are normally regarded as "sovereign" and thus not subject to estoppel. *See, e.g., New Mexico v. Aamodt*, 537 F.2d 1102, 1110 (10th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *United States v. Florida*, 482 F.2d 205 (5th Cir. 1973). *But see United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970) (applying estoppel against the government in suit involving title to land).

spect to "proprietary" contracts—that is, essentially commercial transactions involving the purchase or sale of goods or services—courts have tended to find no significant obstacles to the use of estoppel based on the conduct of government agents acting within the scope of their actual or apparent authority.[16] On the other hand, government transactions found to be exercises of "sovereign" responsibilities, including a diverse range of loan agreements, subsidies and direct grants have continued to be evaluated according to the traditional rule.[17] Such a distinction between the sovereign and proprietary functions of government has served as a shorthand reminder that "protection of the public welfare and deference to Congressional desires are much more apt to outweigh hardships to private individuals in the equitable balance when estoppel is asserted against sovereign acts," than when purely commercial federal interests are at stake.[18]

Despite its practical appeal, an analysis focusing solely on a sovereign vs. proprietary distinction has several significant shortcomings. First, the line between sovereign and proprietary functions is somewhat artificial and difficult to apply.[19] For example, even routine operational contracts of federal agencies may be conditioned on a variety of special requirements imposed by Congress or the Executive for the promotion of national policy goals, thus adding a "sovereign" element to an otherwise purely commercial transaction.[20] Second, although there is some early Supreme Court authority to support the distinction,[21] more recent Supreme Court decisions have either left the issue open, see *Wilber National Bank v. United States*, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798 (1935), or rejected the sovereign vs. proprietary dichotomy altogether. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383, 68 S.Ct. 1, 2, 92 L.Ed. 10 (1947); *Indian Towing Co. v. United States*, 350 U.S. 61, 65, 68, 76 S.Ct. 122, 124, 126, 100 L.Ed. 48 (1955). Finally, exclusive reliance on such a single factor analysis may mask or contradict more basic constitutional, practical and equitable considerations that should be relevant to determining the availability of estoppel in any particular case. Thus, while we believe that the "proprietary" or commercial character of the government activity at issue in the instant case militates in favor of allowing an estop-

---

**16.** *See, e.g., Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657 (Ct.Cl.1973); *Dana Corp. v. United States*, 470 F.2d 1032, 1045 (Ct.Cl.1972); *Manloading & Management Assoc., Inc. v. United States*, 461 F.2d 1299, 1302–03 (Ct.Cl.1972); *United States v. Mailet*, 294 F.Supp. 761, 768 (D.Mass.1968); *Branch Banking & Trust Co. v. United States*, 98 F.Supp. 757, 768–69 (Ct.Cl.), *cert. denied*, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951). *See generally*, Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551, 556–57 (1979).

**17.** *See, e.g., Somerville Technical Services v. United States*, 640 F.2d 1276 (Ct.Cl.1981) (federally subsidized sewer project); *Gressley v. Califano*, 609 F.2d 1265 (7th Cir. 1979) (federal disability benefits); *Hicks v. Harris*, 606 F.2d 65 (5th Cir. 1979) (student loans); *United States v. Florida*, 482 U.S. 205 (5th Cir. 1973) (title to public park lands).

**18.** *Santiago v. Immigration & Naturalization Serv.*, 526 F.2d 488, 496 (9th Cir. 1975) (Choy, J., dissenting), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

**19.** *See United States v. Georgia-Pacific*, 421 F.2d 92, 101 (9th Cir. 1970) ("While it is said that the Government can be estopped in its proprietary role, but not in its sovereign role, the authorities are not clear about just what activities are encompassed by each."); *United States v. City & County of San Francisco*, 112 F.Supp. 451, 454 (N.D.Cal.1953), *aff'd* 223 F.2d 737 (9th Cir.), *cert. denied*, 350 U.S. 903, 76 S.Ct. 181, 100 L.Ed. 793 (1955) (characterizing distinction as "somewhat nebulous and perhaps attenuated"). *See also* Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551, 557 (1979).

**20.** *See, e.g., M–R–S Mfg. Co. v. United States*, 492 F.2d 835 (Ct.Cl.1974) (reporting procedures designed to prevent corrupt bidding practices); Exec. Order No. 11246, *as amended*, 3 C.F.R. 339 (1964–65 Comp.) (affirmative action requirements for federal contractors).

**21.** In *Cooke v. United States*, 91 U.S. 389, 398, 23 L.Ed. 237 (1875), the Court stated that when the federal government "comes down from its position of sovereignty and enters the domain of commerce, it submits itself to the same laws that govern individuals there."

pel claim,[22] we do not view this factor as determinative in all situations.

## IV.

The Supreme Court decision most often cited as authority for refusing to apply estoppel against the government, and relied on heavily by the district court in the instant case, is *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In *Merrill,* an agent of the Federal Crop Insurance Corp., a government corporation established by the Department of Agriculture, advised a farmer that the spring wheat the farmer intended to plant on winter wheat acreage was fully insurable against loss under the Federal Crop Insurance Act (FCIA). The agent's advice was incorrect, since a federal regulation specifically excluded from coverage spring wheat planted on winter wheat acreage. Relying on the agent's representation, however, the farmer completed an application and the corporation issued him an insurance policy. Several months later, the farmer lost his crop and sought to recover on his policy. His claim was denied on the ground that the FCIA regulations excluded the insurance of spring wheat replanted on winter wheat acreage. The farmer filed suit against the corporation, charging that he had relied to his detriment on the statements of the corporation's agent, and alleging that his insurance policy was therefore in effect. The Idaho Supreme Court ruled in favor of the farmer, finding that the corporation's function was comparable to that of a private insurance company, which would be bound under similar circumstances. On the theory that the Government was acting in a proprietary, not a sovereign, capacity, the state court estopped the corporation to deny the validity of the policy or the liability of the Government for plaintiff's loss.

The Supreme Court reversed in a 5-4 decision, implicitly rejecting the sovereign/proprietary distinction relied on by the Idaho court, together with that court's attempt to allow an estoppel claim against the government.[23] Resting its decision primarily upon a separation of powers rationale, the *Merrill* Court observed that only Congress had the authority to charge the public treasury, and noted that persons who deal with the government are charged with knowledge of the United States statutes as well as the federal regulations promulgated under them.[24] The Supreme Court concluded that since Congress had authorized charges against the treasury only to cover insurance claims properly brought under the FCIA, the Court had no power to enforce Merrill's policy, which directly conflicted with the applicable FCIA regulations.

At least three significant differences distinguish the situation in *Merrill* from the facts of the instant case. First, at the time Merrill purchased his insurance, the federal government was apparently the only entity providing the type of all risk crop insurance authorized by the FCIA. *See* 332 U.S. at 383 n.1, 68 S.Ct. at 3 n.1. Thus, even if Merrill had been given accurate informa-

---

**22.** *See* Sections V and VI *infra.*

**23.** The *Merrill* Court stated:

It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, whenever it takes over a business theretofore conducted by private enterprise or engages in competition with private ventures. Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it.

332 U.S. at 383, 68 S.Ct. at 3 (footnote omitted).

**24.** 332 U.S. at 384 85, 68 S.Ct. at 3–4. Further on in the majority opinion, Justice Frankfurter quoted with approval Justice Holmes' well known admonition, in *Rock Island, Arkansas & Louisiana-Railroad Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920), that "[m]en must turn square corners when they deal with the Government." In his dissenting opinion, Justice Jackson, joined by Justice Douglas observed:

It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street.

332 U.S. at 387 88, 68 S.Ct. at 5.

tion, he would not have been able to procure the insurance he desired from an alternate private source. Merrill's claim of detrimental reliance on the government's misrepresentation was, therefore, relatively weak. In the instant case, by contrast, Portmann alleges that if the government had responded accurately to her inquiries, she would not have contracted with the Postal Service, but would have elected instead to do business with a private carrier which would have insured her separation negatives for their full value. Second, the FCIA regulations at issue in *Merrill* clearly and explicitly excluded from coverage "spring wheat which has been reseeded on winter wheat acreage in the 1945 crop year." 332 U.S. at 386, 68 S.Ct. at 4, *quoting* Sec. 414.37(v) of Wheat Crop Insurance Regulations, 10 Fed.Reg. 1591. The postal regulation at issue here, by contrast, is anything but explicit.[25] Even if Portmann had examined the regulation independently, therefore, it would not have been unreasonable for her to have assumed, consistent with the postal clerk's representation, that her separation negatives were eligible for document reconstruction insurance. Thus, the Supreme Court's admonition in *Merrill* that "[m]en [and women] must turn square corners when they deal with the Government,"[26] has little application to the instant case. Finally, because the operations of the Postal Service are financed almost entirely from a self-sustaining fund generated out of the business revenue received by the Service, the *Merrill* Court's reasoning that only Congress has the power to charge the public treasury, is similarly inapplicable to the instant situation. *See Part VI infra.*

In its more recent decisions, the Supreme Court has backed away from its suggestion in *Merrill* that equitable estoppel may never be asserted against the federal government. In *Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), the Court rejected an alien's attempt to resist deportation on equitable estoppel grounds, but remarked in dicta that the misconduct of which the petitioner complained was insufficient to estop the government.[27] This dictum raised the possibility that certain types of governmental misconduct might be sufficient to create an estoppel. Twelve years later, in *United States Immigration & Naturalization Service v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam), the Supreme Court, referring to the *Montana* dictum, observed that the *Montana* Court did not pass on the question "whether 'affirmative misconduct' on the part of the Government might estop it from denying

**25.** *See* Section II *supra.* Indeed, the government admits in its brief that the Postal Service amended the applicable insurance regulations shortly after Portmann filed suit in order "to clarify insurance coverage and improve customer understanding and administration of insurance claims." Government's Brief at 6 n.5. *See* note 5 *supra.*

**26.** 332 U.S. at 385, 68 S.Ct. at 3, *quoting Rock Island, Arkansas & Louisiana Railroad Co. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).

**27.** Petitioner in *Montana* had been born in Italy of a native born American who was temporarily residing in that country. Prior to the petitioner's birth, his mother had requested a passport from the American Consul so that she might return to the United States. The American Consul apparently declined to issue her a passport, explaining, incorrectly, that she could not return in her pregnant condition. Because of this erroneous information, petitioner's mother was still residing in Italy at the time of petitioner's birth. In 1906, petitioner and his parents came to the United States, and resided there (although petitioner and his father were never naturalized) for the next fifty years until petitioner was ordered deported. Resisting the deportation order, petitioner argued before the Supreme Court that the Government should be estopped to deny him citizenship since his mother had been prevented from returning to the United States before his birth by the erroneous information supplied by the American consular official.

In rejecting petitioner's estoppel claim, the Supreme Court noted that as of 1906, the United States did not require a passport for a citizen to return to this country, and that petitioner had presented no evidence that Italian authorities imposed such a requirement on Americans desiring to leave Italy at that time. In light of these circumstances, the Court held that the Consul's erroneous advice "falls far short of misconduct such as might prevent the United States from relying on petitioner's foreign birth." 366 U.S. at 314·15, 81 S.Ct. at 1341.

citizenship . . . ." 414 U.S. at 8, 94 S.Ct. at 21–22. The Court in *Hibi*, however, again rejected petitioner's citizenship claim, holding that the governmental action complained of could not be characterized as "affirmative misconduct," and, thus, that estoppel would not lie against the government. *See* 414 U.S. at 8–9, 94 S.Ct. at 21–22.[28] In retrospect, *Hibi* was not a strong case for invoking estoppel against the government, since not all the requisite elements of an equitable estoppel were present.[29] In particular, there was no misrepresentation by the government or its agents, but merely a failure to inform Hibi of his rights under the Nationality Act of 1940. *See* 414 U.S. at 7–8, 94 S.Ct. at 20–22. Moreover, even assuming that the failure to disclose relevant information might, under some circumstances, provide proper grounds for estopping the government, petitioner in *Hibi* made no showing that he had relied to his detriment on the government's silence. Note, *Equitable Es-*

*toppel of the Government*, 47 Brooklyn L.Rev. 423, 439 (1981).

Thus, although the Supreme Court has been extremely reluctant to estop the federal government, it has not entirely foreclosed the possibility of applying estoppel in an appropriate case. Indeed, in its most recent decision on the subject, the Supreme Court expressly stated that "[t]his Court has never decided what type of conduct by a government employee will estop the government from insisting on compliance with valid regulations governing the distribution of welfare benefits." *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981). Moreover, in refusing to apply estoppel against the Social Security Administration in *Schweiker*, the Supreme Court carefully distinguished the Social Security issue before it in that case from several other situations, not involving government entitlement programs, in which lower federal courts had applied estoppel against the government.[30] The Court noted that in several of the cases it

**28.** Petitioner in *Hibi* was a native of the Philippines who had served with the United States Army during World War II. The Nationality Act of 1940 provided that non-citizens who had served in the United States armed forces during World War II could be naturalized, and that non-citizens who had served outside the continental limits of the United States were exempt from the usual citizenship requirements of United States residency and proficiency in the English language. Applicants for citizenship, pursuant to these provisions, were required to file naturalization petitions by December 31, 1946. To assist such applicants, Congress authorized the appointment of naturalization officers who, between 1943 and 1946, traveled to several countries and naturalized thousands of foreigners. Although such an immigration officer was installed in the Philippines in 1945, he was removed by the U. S. Attorney General shortly thereafter. Accordingly, Hibi, who was eligible for citizenship at the time the officer was removed, was never naturalized in the Philippines. Hibi came to the United States for the first time in 1964 and filed a petition for naturalization pursuant to the Nationality Act. In his petition, Hibi contended that the United States should be estopped to enforce the December 31, 1946 deadline, since the government had failed during Hibi's period of eligibility to encourage him to make a timely petition for naturalization.

**29.** For a classic and oft-cited statement of the requirements of an equitable estoppel, see J.

Pomeroy, Equity Jurisprudence § 805 at 191–92:

> 1. There must be conduct—acts, language, or silence—amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, and, thus relying, he must be led to act upon it. 5. He must in fact act upon it in such a manner as to change his position for the worse . . . .

**30.** *See* 450 U.S. at 788–89 n.4, 101 S.Ct. at 1471 n.4. Among the cases distinguished by the *Schweiker* Court were *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973); *United States v. Fox Lake State Bank*, 366 F.2d 962 (7th Cir. 1966); *Semaan v. Mumford*, 335 F.2d 704 (D.C.Cir.1964); and *Walsonavich v. United States*, 335 F.2d 96 (3rd Cir. 1964). For a discussion of these cases, see *Schweiker*, 450 U.S. at 792-93, 101 S.Ct. at 1473 (Marshall, J., dissenting).

distinguished, "the government had entered into written agreements which supported the claims of estoppel," and that in others, "estoppel did not threaten the public fisc," as the Court felt it would in *Schweiker*. The instant case arguably exhibits both of these distinguishing characteristics.

In sum, we find nothing in any of the Supreme Court's estoppel decisions which clearly forecloses the availability of estoppel in the instant case. Nor do we believe that this court's decision in *Gressley v. Califano*, 609 F.2d 1265 (7th Cir. 1979), disposes of Portmann's estoppel argument. *Gressley*, like *Schweiker*, was a government benefits case, in which a claimant argued that erroneous information supplied by a Social Security representative should estop the government from denying disability benefits to someone not statutorily entitled to receive such benefits. In the instant case, unlike *Gressley*, we are not dealing primarily with a statutory benefit but more directly with a written contract between the Postal Service and a private citizen. Under the terms of this contract, the Service agreed, for a valuable consideration, to promptly deliver Portmann's separation negatives to a specified location, or to reimburse Portmann if her articles were lost. In reliance on the postal clerk's assurance that this contract included the purchase of Document Reconstruction Insurance, Portmann agreed to do business with the Postal Service to the exclusion of other express carriers who would have insured her separation negatives for their full value. As a direct result of the government's misrepresentation, therefore, Portmann was barred *not* from receiving a statutory benefit available only from the government (as in *Gressley* and *Schweiker*), but from collecting the actual damages she incurred as a result of the Postal Service's non-delivery, *and* from contracting with a private entity which would have reimbursed her for this loss. *Cf. Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

### V.

Our conclusion that equitable estoppel may be available against the government in the instant case is supported by numerous decisions of this and other courts of appeal. As early as 1966, this court, in *United States v. Fox Lake State Bank*, 366 F.2d 962 (7th Cir. 1966), held the federal government estopped to bring an action under the Civil False Claims Act against a bank that had relied heavily on the advice of federal agents in preparing the disputed claims applications. The *Fox Lake* court held that although "the doctrine of estoppel must be applied with great caution to the government and its officials ... in proper circumstances the doctrine does apply." 366 F.2d at 965. Contemporaneous decisions in the Third and District of Columbia Circuits reached similar holdings. Thus, in *Semaan v. Mumford*, 335 F.2d 704 (D.C. Cir. 1964), the District of Columbia Circuit held that plaintiff's pleadings and affidavits were sufficient to raise a factual issue as to whether the Library of Congress, by engaging in a course of conduct which had led plaintiff to believe he had been elevated to permanent employee status, was estopped to deny plaintiff the procedural rights of a permanent employee upon discharge. Similarly, in *Walsonavich v. United States*, 335 F.2d 96, 101 (3rd Cir. 1964), the Third Circuit applied estoppel against the government in a federal tax case, ruling that although estoppel is rarely invoked against the federal government, "there are circumstances where the Government should be required by our law to stand behind [its] written agreements ... in order to prevent manifest injustice." *See also United States v. Gross*, 451 F.2d 1355, 1358 (7th Cir. 1971) (suggesting that the government may be estopped where "the facts upon which the private party relied to his detriment were addressed or communicated directly to him by a government official"); *Manloading & Management Assoc., Inc. v. United States*, 461 F.2d 1299 (Ct.Cl.1972) (where agency representative, at bidding conference, had advised prospective contractor that his contract would definitely be renewed for the next fiscal year, government was estopped from reprocuring the contract, in accord-

ance with normal agency procedure, at the start of the new year); *Simmons v. United States*, 308 F.2d 938, 945 (5th Cir. 1962) (in proper circumstances, equitable estoppel may be invoked against the United States in internal revenue cases).

More recently, in *Mendoza-Hernandez v. Immigration & Naturalization Service*, 664 F.2d 635 (7th Cir. 1981), this court declined, on the facts before it, to apply equitable estoppel against the Immigration and Naturalization Service (INS) but stated that "affirmative misconduct" which actually prejudiced an alien would estop the government from denying the alien the relief he requested. 664 F.2d at 639. In addition, cases in the Second, Third and Ninth Circuits have squarely held that affirmative misconduct on the part of the INS will estop the government from insisting on compliance with otherwise valid immigration regulations. *See Corniel Rodriquez v. Immigration & Naturalization Service*, 532 F.2d 301 (2d Cir. 1976) (failure of American consul to warn prospective alien that she would forfeit special immigration status if she married before being admitted to the United States estopped INS from later deporting alien, who had married her childhood sweetheart three days before leaving Dominican Republic); *Villena v. INS*, 622 F.2d 1352 (9th Cir. 1980) (where INS did not respond to alien's petition for preference classification for almost four years with no apparent justification for the delay, INS was estopped from claiming that the alien had failed to adequately pursue his preference claim); *Yang v. Immigration & Naturalization Service*, 574 F.2d 171 (3d Cir. 1978) (proof of affirmative misconduct on part of INS would entitle petitioner to relief, on equitable estoppel grounds, from deportation proceedings). *See also Santiago v. Immigration & Naturalization Service*, 526 F.2d 488 (9th Cir. 1975) (estoppel available in the citizenship and immigration context where there has been affirmative misconduct on the part of the government).

A series of cases in the Ninth Circuit also illustrates the increased judicial willingness to entertain estoppel claims against the federal government. In *United States v. Georgia-Pacific*, 421 F.2d 92 (9th Cir. 1970), the Ninth Circuit estopped the federal government from enforcing a contract involving the transfer of title to certain forest lands against a defendant who had invested a considerable sum of money in the property, in reliance upon a government land order later declared invalid by the Executive Branch. The court in *Georgia-Pacific* suggested that the federal government could be estopped where (1) the government is acting in a proprietary capacity; and (2) the government agent whose advice has been relied upon acted within the scope of his authority. 421 F.2d at 100–01. Shortly thereafter, in *Brandt v. Hickel*, 427 F.2d 53 (9th Cir. 1970), the Ninth Circuit applied estoppel against the federal government even though the representation relied upon was conceded to be unauthorized. In *Brandt*, plaintiff-appellant had submitted a noncompetitive oil and gas lease bid to a regional Land Management office. The bid was rejected because of a technical error, but the regional Land Manager allowed Brandt 30 days to resubmit her offer, without loss of priority. On the basis of this representation, Brandt opted to forego an appeal of the rejection and, instead, filed an amended offer within the 30 day period. Subsequently, the Secretary of the Interior ruled that the Land Manager's action was unauthorized and without effect, and that by failing to appeal the rejection of her bid, Brandt had forfeited the right to assert the validity of her original offer.[31] The Ninth Circuit reversed, holding that the Secretary was estopped to disavow the Land Manager's statement even though that statement "was unauthorized by statute, regulation, or decision." 427 F.2d at 56. In explaining its decision, the Ninth Circuit stated:

> Not every form of official misinformation will be considered sufficient to estop the government.... Yet some forms of er-

---

**31.** The Secretary also ruled that the land office had no authority to accept Brandt's amended offer, since another bid had been filed in the interim, thus destroying Brandt's priority. *See* 427 F.2d at 55.

roneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement.

427 F.2d at 56.

Twelve years later, in *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973), the Ninth Circuit again applied estoppel against the federal government, this time to bar it from maintaining an action to recover excess payments made to several business partners under the Federal Soil Bank Program. The court in *Lazy FC Ranch* held that estoppel should be available even where the government is acting in a sovereign capacity "if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." 481 F.2d at 989. Similarly, in *California Pacific Bank v. Small Business Administration*, 557 F.2d 218 (9th Cir. 1977), the Ninth Circuit, citing both *Lazy FC Ranch* and § 320 of the Restatement (Second) of Contracts, held that where a private party seeks to estop the government from disavowing an arrangement it had previously condoned or entered into, estoppel should be available "where justice and fair play require it," i.e. where the government's change in position threatens a serious injustice, and the interests of the public will not be unduly jeopardized by the estoppel claim. 557 F.2d at 224. *See also Investors Research Corp. v. Securities and Exchange Com.*, 628 F.2d 168, 174 n.34 (D.C. Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980), ("The fundamental principle of equitable estoppel applies to government agencies as well as private parties."). *Cf. United States v. Lucienne D'hotelle de Benitez Rexach*, 558 F.2d 37, 43 (1st Cir. 1977) ("Although estoppel is rarely a proper defense against the government, there are instances where it would be unconscionable to allow the government to reverse an earlier position.")

▆ Recently, in *TRW, Inc. v. Federal Trade Com.*, 647 F.2d 942 (9th Cir. 1981), the Ninth Circuit reaffirmed its prior decisions holding that equitable estoppel could be applied against the government "in proper circumstances," *United States v. Fox Lake State Bank*, 366 F.2d 962, 965 (7th Cir. 1966), and set forth five requirements for determining when such circumstances exist:

First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury.

647 F.2d at 950–51 (citations omitted). In addition, the Ninth Circuit noted that "the government action upon which estoppel is to be based, must amount to affirmative misconduct," which that court defined as "something more than mere negligence." 647 F.2d at 951. *Accord United States v. Ruby Co.*, 588 F.2d 697, 703–04 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). We believe that these factors accurately reflect the central equitable considerations relevant to determining the availability of estoppel against the government in any particular case. They should thus form the basis of the district court's inquiry on remand in the instant case. We further believe that other factors identified in this court's prior estoppel decisions, including the type of government activity being pursued, the reasonableness of plaintiff's reliance, and the potential danger, posed by estoppel, of undermining important federal interests or risking a severe depletion of the public fisc, may appropriately be weighed in the equitable balance. *See e.g., Strauch v. United States*, 637 F.2d 477, 482 (7th Cir. 1980); *Champaign County v. United States Law Enforcement Assistance Administration*, 611 F.2d 1200, 1205 n.8 (7th Cir. 1979); *Gressley v. Califano*, 609 F.2d 1265, 1267–68 (7th Cir. 1979).

VI.

Our decision that equitable estoppel may be available against the government in the

instant case is also supported by the somewhat unique, quasi-private status of the United States Postal Service. In enacting the Postal Reorganization Act of 1970,[32] Congress intended to "[c]onvert the Post Office Department into an *independent establishment* within the Executive Branch of the Government," unencumbered by direct political pressure and capable of delivering the mail in an efficient and "business like" manner. H.R.Rep.No.1104, 91st Cong., 2d Sess. 1104, *reprinted in* [1970] U.S.Code Cong. & Ad.News 3649, 3650 (emphasis added). To effectuate this goal, Congress clothed the Service with broad and extensive powers, including the ability "to sue and be sued in its official name," 39 U.S.C. § 401(1), the power "to enter into and perform contracts, execute instruments, and determine the character of, and necessity for, its expenditures," 39 U.S.C. § 401(1), and the authority to "settle and compromise claims by or against it." 39 U.S.C. § 401(3). Moreover, except as specifically provided for in the Reorganization Act itself, Congress exempted the Postal Service from all "Federal law[s] dealing with public or federal contracts, property, works, officers, employees, budgets or funds." 39 U.S.C. § 410 (1976). *See* H.R.Rep.No.1104, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 3649, 3674. In addition, by establishing a special self-sustaining Postal Service Fund within the Treasury Department, and by entrusting the Service with broad financing powers, Congress meant to put the Postal Service on an independent financial basis, requiring only transitional appropriations through the Congressional budgetary process. *See Standard Oil Div., American Oil Co. v. Starks*, 528 F.2d 201, 203 (7th Cir. 1975); 39 U.S.C. §§ 2003–2009 (1976).

In light of these considerations, virtually all courts that have considered the question have concluded that the Postal Service is *not* immune, as is the federal government generally, from commercial or judicial garnishment proceedings. *See, e.g., Standard Oil Div., American Oil Co. v. Starks*, 528 F.2d 201 (7th Cir. 1975); *Beneficial Finance Co. v. Dallas*, 571 F.2d 125 (2d Cir. 1978); *May Dept. Stores Co. v. Williamson*, 549 F.2d 1147 (8th Cir. 1977).[33] Moreover, in reaching this conclusion, this court, in *Standard Oil Div., American Oil Co. v. Starks*, took issue, both factually and legally, with the Postal Service's contention that it was entitled to immunity either because "it ha[d] not been 'launched into the commercial world'" 528 F.2d at 204, or because it was performing an exclusively governmental function. Speaking for a unanimous panel, Judge Wood stated:

> Factually [the Postal Service's] operations cannot be described as "exclusively" governmental. Indeed most of its work is not governmental in nature. The powers that are set out in § 401 and outlined above in Part II of this opinion are powers that are common to any business organization. The delivery of mail itself is not inherently an operation that must be government-operated and in fact is not exclusively so operated today. The United Parcel Service is but one example of a private mail delivery system; in addition, Consumer Services Corporation in Ohio, Private Postal System of America in Florida, and American Postal Corporation on the West Coast all are presently delivering third and fourth class mail.

528 F.2d at 204. *See also Beneficial Finance Co. v. Dallas*, 571 F.2d 125, 128 (2nd Cir. 1978) (Postal Service possesses many powers equivalent to a private business enterprise, and competes with private carriers in the delivery of non-letter mail).

We believe that such considerations also argue in favor of permitting estoppel against the Postal Service in the instant situation. In transporting Ms. Portmann's separation negatives, the Service was not

---

**32.** Act of Aug. 12, 1970, Pub.L.No.91–375, 84 Stat. 719, *codified at* 39 U.S.C. § 101 *et seq.* (1976).

**33.** These holdings are particularly significant in light of the fact that the statutory predecessor of the Postal Service, the United States Post Office Department, "had been a sovereign federal instrumentality, immune from state power or regulation." *Beneficial Finance Co. v. Dallas*, 571 F.2d 125, 128 (2nd Cir. 1978).

performing an inherently sovereign or peculiarly governmental function. Instead, it was competing directly for plaintiff's business with a number of private express mail carriers. Under these circumstances, we see no reason why the Postal Service should not be held to the same commercial standards in dealing with its customers as would an analogous private entity. *Cf. Kennedy Electric Co. v. United States Postal Service,* 508 F.2d 954, 959 (10th Cir. 1974) (upholding subcontractor's equitable lien against Postal Service despite Service's claim of immunity, on grounds that "Service is just as amenable to the judicial process as is a private enterprise.")

In addition, we think we would do the Postal Service no competitive favor by conferring on it an absolute immunity from estoppel in the circumstances of this case. As we have suggested, no threat to the public fisc is directly involved. But the dubious privilege of not being bound by the representations of its employees in routine commercial transactions would seem to further reflect on the Service's already tarnished reputation as a provider of regular and express mail service. Certainly, to emphasize the Postal Service's position as merely one of several competitors for express business is to put this case in its own realistic context, quite distinct, for example, from that of the Social Security Administration in *Schweiker v. Hansen.*

### Conclusion

In sum, we hold that the district court erred in concluding, as a matter of law, that equitable estoppel could not lie against the United States Postal Service in the instant situation. We therefore reverse the district court's grant of summary judgment in favor of the government, and remand for a determination whether the factors set out in Part V of this opinion warrant the application of estoppel to the facts of this case.

Reversed And Remanded.