**COMMUNITY HEALTH SERVICES OF CRAWFORD COUNTY, INC., a non-profit corporation, Ada Werner, an individual, Frank E. Werner, an individual, and Shirley Sorger, an individual, Plaintiffs-Appellants,**

v.

**Joseph A. CALIFANO, Jr., Secretary of the Department of Health, Education and Welfare, and the Travelers Insurance Companies, a corporation, Defendants-Appellees.**

**COMMUNITY HEALTH SERVICES OF CRAWFORD COUNTY, INC., a non-profit corporation, Plaintiff-Appellant,**

v.

**Patricia Roberts HARRIS, Secretary of the Department of Health, Education and Welfare, and the Travelers Insurance Companies, a corporation, Defendants-Appellees.**

No. 82–5098.

United States Court of Appeals, Third Circuit.

Argued Sept. 29, 1982.

Decided Jan. 19, 1983.

Rehearing Denied Feb. 14, 1983.

Raymond G. Hasley, Brian W. Ashbaugh (argued), Rose, Schmidt, Dixon & Hasley, Pittsburgh, Pa., for plaintiffs-appellants.

David R. Culp, Acting Regional Atty., James S. Feight, Jr., Asst. Regional Atty., James C. Newman (argued), Dept. of Health and Human Services, Philadelphia, Pa., for defendants-appellees.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Since time immemorial it has been argued that "The King can do no wrong;" therefore, his subjects can neither complain of, nor be indemnified for, the "wrongs" of the King nor for the wrongs of the King's agents. In a different context, we are now asked to affirm a somewhat similarly archaic concept in favor of the United States government, regardless of its effect on innocent persons. Even though the agent of the Secretary of Health and Human Services [1] on *five* different occasions over a two

---

* Honorable H. Curtis Meanor, United States District Court for the District of New Jersey, sitting by designation.

1. This department was called the Department of Health, Education, and Welfare when this cause of action arose. We will refer to this Department by its present name, the Department of Health and Human Services.

and one-half year period wrongly advised a charitable health care provider that certain costs were reimbursable, and even though the health care provider in good faith made expenditures and *incurred obligations* in excess of $70,000 in reliance on the explicit advice of the agent of the Secretary, and even though the repayment of those "costs" may cause a significant diminution of home health care availability to ill and poor people in a rural medically underserved area, the Secretary now seeks to hold the health care provider liable for recoupment of the reimbursed costs. In effect, the government seems to argue that: "We, just like the King and his agents, can do no wrong, regardless of the grievous consequences we cause innocent people."[2] The issue we must decide is whether, on the facts of this case, the Secretary can be estopped from recouping monies from the very party that was induced, by the government agent's totally erroneous advice, into incurring the expenses for which the reimbursements were made.

Appellants, Community Health Services of Crawford County, Inc. (CHS), a nonprofit corporation and Ada Werner, Frank E. Werner, and Shirley Sorger, individuals within the county who utilize CHS' services, ask this court to set aside the summary judgment order of the United States District Court for the Western District of Pennsylvania. Plaintiffs/Appellants have filed two separate suits against the Secretary and its agent, the Travelers Insurance Companies (Travelers). Appellants claim that the decisions of the Provider Reimbursement Review Board (PRRB) and the Secretary, which allowed recoupment of overpayments to CHS under Medicare cost reimbursement procedures, were erroneous. Though appellants assert several grounds for reversal, we agree only that the District Court erred in finding that the United States cannot be estopped from recouping the alleged overpayment. Under the egregious facts of this case and in view of the affirmative misconduct of the government's agent—Travelers—we will reverse the judgment of the district court.

### I.

CHS is a charitable health care provider incorporated under the laws of Pennsylvania. In 1966 it entered into an agreement with the Secretary whereby CHS agreed to provide home health care services to eligible individuals under the Medicare provisions of the Social Security Act.[3] The Secretary agreed to reimburse CHS for reasonable costs of such services. In April, 1975, CHS entered into contracts with the Mercer County Consortium Services, Inc. by which CHS was to employ participants in a program established under the Comprehensive Employment and Training Act of 1973[4] (CETA) which is designed to provide job training and experience for unemployed individuals to enhance their future employability. Under the terms of the CETA grants, "CHS was to employ program participants furnished by the regional CETA administration, and it was to be reimbursed for the salaries and fringe benefits paid to those employees."[5]

John C. Wallach, CHS' administrator, testified that CETA workers enabled the agency to expand the range of services it provided and to meet the mushrooming demand for health services in the economically depressed and impoverished rural area in which it functioned.[6] CHS had designated the county that CHS serves as a medically

---

**2.** In the government's brief, counsel phrased the issue as follows:

> It is a well established principle of law that estoppel can not be asserted against the government on the basis of alleged misinformation furnished by an employee or agent of the government, even if there is detrimental reliance on that information.

Appellee's Brief at 26.

**3.** 42 U.S.C. § 1395 *et seq.*

**4.** 29 U.S.C. § 801 *et seq.*

**5.** *Community Health Services, Inc. v. Harris,* No. 80–56, Memorandum Opinion, Joint Appendix at 186a.

**6.** Transcript of Proceedings before the PRRB (Transcript) at 094–095, 0100–0103, 0106–0108, 0123–0128.

underserved area.[7] It is understandable that from 1975 to 1978 CHS' units of service burgeoned from just under 4,000 to 81,000 per year. In 1979 they increased to over 100,000 units of service.[8] CETA funds became a critical source for financing this expansion because CHS was otherwise dependent upon Medicare reimbursements and charitable contributions.[9] In 1975–1976, CETA grants of $53,402 represented 25% of CHS' budget; in 1976–1977 CETA grants of $81,141 represented 24% of its budget; in 1977–1978, CETA grants of $104,524 represented 18%.[10]

Medicare regulations provide that revenue received by providers in the form of donor-restricted grants, or gifts that must be used to pay designated operating expenses, must be set off against the expenses submitted to Medicare for reimbursement in the provider's cost report.[11] However, the *Provider Reimbursement Manual* at § 612 provides an exception to required offsets known as "Seed Money Grants."[12] "Seed Money" is defined in § 612.2 as "[g]rants designated for the development of new health care agencies or for expansion of services of established agencies...."[13] Thus, the critical question arose as to whether the CETA grants had to be offset against expenses CHS submitted to Medicare for reimbursement.

The administrative structure established under Medicare made it quite difficult for CHS to get an answer to the above question. The administrative process precluded CHS from presenting an inquiry directly to the Secretary. Rather, it was required to consult a fiscal intermediary appointed by the Secretary to serve as his agent. The intermediary's primary duty involved processing claims and payments to providers such as CHS. The intermediary was required statutorily to relay information and instructions from the Secretary to providers and to serve as a channel of communication from providers to the Secretary.[14] Consequently, Wallach presented the question of the appropriate treatment of CETA funds to the intermediary, appellee Travelers Insurance Companies. From 1975 to August 1977, Wallach discussed this issue with Michael Reeves, Travelers' Medicare Manager, on five separate occasions.[15] On each occasion, Reeves advised Wallach that Medicare would not offset the CETA grants against reimbursable costs because they qualified as a "seed money" exception to reimbursement offsets as provided in § 612.2 of the *Provider Reimbursement Manual.*[16] CHS prepared its cost reports without offsetting its CETA grants from its reimbursable costs, and Travelers approved CHS' reports for the years 1975, 1976 and 1977. CHS used this additional money to finance the expansion of the health care services it provided to Medicare beneficiaries.[17]

During the years that CHS inquired into the treatment of CETA grants, the Secretary had neither formulated nor promulgated an official policy on the treatment of CETA funds. Administrative procedures applicable to this situation obliged Reeves to refer CHS' inquiries to the Health Care Financing Administrator. Consequently, Reeves was making a policy judgment in his own discretion in advising CHS that CETA funds were seed money and did not have to be offset. It was not until August 4, 1977 that he finally requested instructions about the treatment of CETA grants from the Philadelphia office of the Department's Bureau of Health Insurance as Reeves testi-

7. *Id.* at 095.

8. *Id.* at 0128.

9. *Id.* at 099.

10. *Id.* at 0132, 0136.

11. 42 C.F.R. § 405.423(a).

12. Quoted in *Community Health Services v. Harris,* Joint Appendix at 188a–189a.

13. *Id.* at 188a.

14. 42 U.S.C. § 1395h.

15. Transcript at 0146.

16. *Id.* at 0104–0105, 0146–0147.

17. *Id.* at 0107–0108, 0110–0114.

fied he was required to do under administrative procedures.[18]

The instructions Reeves received from Robert C. Griffith, the Program Officer of the Health Care Financing Administration, contradicted the advice Reeves had given to CHS. Griffith declared that CETA funds did not qualify as seed money and were therefore to be offset against the provider's reimbursable costs.[19] CHS was advised of this instruction by letter dated October 7, 1977 and personally by Reeves on November 9, 1977.[20]

Statutory procedures [21] authorize the Secretary to periodically review providers' cost reports. Thus, a determination made by an intermediary may be reopened and revised if, within three years after notice of the intermediary's determination, the Secretary notifies the intermediary that its determination is inconsistent with applicable law, regulations or general instructions of the Secretary.

Claiming authority under 42 C.F.R. § 405.1885, the Secretary reopened CHS' cost reports for 1975, 1976 and 1977 to recoup the CETA funds he claimed should have been offset against the costs Medicare reimbursed for those years. Beginning in May 1978, Travelers issued Notices of Program Reimbursements to recapture from CHS the following amounts: for the cost year ending October 31, 1975, $7,694.00; for the cost year ending October 31, 1976, $32,460.00; for the cost year ending October 31, 1977, $31,326.00. The total for the three years, $71,480, was to be offset against Medicare reimbursements owed to CHS for services it had provided to Medicare beneficiaries.[22] The Secretary demanded that CHS return these alleged overpayments pursuant to 42 C.F.R. § 405.1885. CHS filed a civil action [23] against the Secretary and Travelers requesting the district court to enter a Temporary Restraining Order and an injunction claiming that the Secretary's and Travelers' actions were unlawful and would bankrupt it and force it to cease providing health services to its beneficiaries. Three beneficiaries joined CHS as plaintiffs.[24] The district court granted plaintiffs' petition for a Temporary Restraining Order against the Secretary and Travelers.[25] CHS then pursued administrative remedies through an appeal from the Secretary's decision filed with the PRRB. On November 13, 1979, by stipulation of counsel, the Secretary agreed to cease recouping any of the alleged overpayments, and CHS agreed to a stay in its civil action.[26]

18. *Id.* at 0179.

19. *Id.* at 0276.

20. *Community Health Services, Inc. v. Harris,* Joint Appendix at 187a.

21. 42 U.S.C. § 1395g(a), 42 C.F.R. § 405.1885.

22. Transcript at 0619–0621.

23. *Community Health Services v. Califano,* No. 78–74–B, Joint Appendix at 8a–19a.

24. These beneficiaries made the following claims: Ada and Frank Werner asserted that, as beneficiaries under the Medicare Act, they had accrued a vested right to services by virtue of their payments into the Social Security system and supplementary medical insurance programs for the aged and disabled. As beneficiaries, they had been, and were likely to become again, recipients of services provided by CHS under the Medicare Act.

Shirley Sorger claimed to be a current beneficiary with an accrued right to CHS' services under the Medicare Act by virtue of a disability due to multiple sclerosis.

In support of their petition, the beneficiaries asserted:

23. If CHS is forced to curtail services because of defendants' arbitrary, unlawful and capricious acts and determinations, the individual plaintiffs herein will be deprived of their property interest and right to services under the Medicare Act. This deprivation is likely to cause the individual plaintiffs to be forced out of their homes in order to obtain adequate medical care now provided by CHS. Further, since Crawford County is substantially classified as a "Medically Underserved Area" by the Secretary (see Exhibits "D", "E" and "F"), the individual plaintiffs are likely to be caused severe medical injury, including possibly death, because of the lack of medical facilities and services.

Joint Appendix at 12a, 18a.

25. *Id.* at 69a–71a.

26. *Id.* at 107a–108a.

A hearing was held before the PRRB on January 22, 1980, and the Board rendered its decision on March 12, 1980.[27] The PRRB concluded that the CETA grants did not come within the "seed money" exception to reimbursement offsets and that CHS would have to return these monies for the cost years 1976 and 1977. CHS was not required to return those for the cost year 1975 since the notice of reopening was improper and could not be reissued because the three year statutory limitation on reopening the 1975 cost report had expired. The PRRB's decision thus reduced the alleged overpayment to $63,839.

CHS then brought Civil Action No. 80–56B in the United States District Court on April 10, 1980 to review the PRRB's determination of the $63,839 for the cost years 1976 and 1977.[28] On the Secretary's unopposed motion, the Court consolidated civil action No. 78–74B with this action.[29] The parties filed motions for summary judgment. On December 29, 1980, the court granted the Secretary's and Travelers' motion for summary judgment and denied that of CHS and the individual beneficiaries.[30]

On January 14, 1982, appellants filed their notice of appeal. They claim, *inter alia,* that the Secretary should be estopped from recovering the overpayments because his affirmative misconduct induced CHS to include in its cost reports expenses that were covered by CETA grants. We agree with the appellants.

## II.

Justice Marshall recently wrote in a dissent that the Supreme Court assumes "that we will know an estoppel when we see one—[but the majority] provides inadequate guidance to the lower courts in an area of the law that . . . is far from settled."[31] As we seek to ascertain and reconcile the conflicting rationales proffered for application or rejection of the estoppel doctrine in a broad variety of cases involving the government, like Justice Marshall, we find this issue far from settled. Thus, we will first explain the doctrine's historical underpinnings, then trace the recent doctrinal developments and conclude by applying what we believe are the most controlling and compelling precedents to the facts of this case.

The doctrine of estoppel is used to prevent a litigant from asserting a claim or a defense against another party who has detrimentally changed his position in reliance upon the litigant's misrepresentation or failure to disclose some material fact.[32] The elements of estoppel ordinarily include a misrepresentation or omission of a material fact by one party; reasonable reliance on that misrepresentation by the other party; and detriment to the other party.[33]

Courts traditionally have been reluctant to apply estoppel against the government. Considerations of sovereign immunity, separation of powers and public policy, such as the fear of binding the government by the improper acts of its agents because of possible resultant fraud and collusion or the severe depletion of the public treasury, explain this judicial reluctance.[34] However, with the great expansion of governmental operations, courts have recently shown a greater willingness to apply estoppel

27. Case No. 78–215, Decision 80–D12. The PRRB's decision is in Transcript at 0012–0017.

28. CHS' complaint is in Joint Appendix at 94a–103a. The answer is in Joint Appendix at 104a–105a.

29. *Id.* at 109a.

30. *Id.* at 185a–196a.

31. *Schweiker v. Hansen,* 450 U.S. 785, 792, 101 S.Ct. 1468, 1473, 67 L.Ed.2d 685 (1981) (Marshall, J. dissenting).

32. *Portmann v. United States,* 674 F.2d 1155, 1158 (7th Cir.1982).

33. *Brown v. Richardson,* 395 F.Supp. 185, 191 (W.D.Pa.1975).

34. See the general discussion of the doctrine of governmental estoppel in *Portmann v. United States,* 674 F.2d at 1158–60; K. Davis, Administrative Law Treatise §§ 17.01, 17.03–17.04 (2d Ed. 1 Supp. 1982); Note, Equitable Estoppel of the Government, 99 Colum.L.Rev. 551 (1979).

against the government in specific circumstances.[35]

Although the Supreme Court continues to manifest reluctance to apply estoppel against the federal government, it has acknowledged that estoppel may be properly applied against the government under certain circumstances.[36] However, it "has never decided what type of conduct by a Government employee will estop the Government from insisting on compliance with valid regulations governing the distribution of welfare benefits." [37]

■ Several circuits, including this circuit, have held that "affirmative misconduct" on the part of a government official will entitle petitioner to invoke estoppel against the government.[38] While the Supreme Court has not explicitly adopted the theory of estoppel because of the affirmative misconduct of a governmental official, the Court has given it tacit recognition in decisions holding that the complained of action did not rise to affirmative misconduct warranting the application of estoppel. For example, in *INS v. Hibi*,[39] the Court asserted that, "while the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy,* 366 U.S. 308, 314, 315, 81 S.Ct.

1336, 1340–1341, 6 L.Ed.2d 313 (1961), no conduct of the sort there adverted to was involved here." [40] Just last year the Court similarly held that a Social Security Administration employee's erroneous statement that a woman was ineligible for benefits, and his failure to advise her to apply for them, was less than affirmative misconduct and did not estop the Administration from denying her retroactive benefits.[41] The Court's rationale for this result is, *inter alia,* that the employee's failure to advise the woman was a breach of a manual guideline that did not constitute a regulation and did not have legally binding force. Moreover, petitioner failed to satisfy the procedural requirement of filing an application. Thus, petitioner failed to fulfill her statutorily imposed duty essential to receiving benefits.

*Schweiker v. Hansen, supra,* implies that one example of affirmative misconduct is the failure of a government employee to perform an act that is required by law. The Second Circuit explicitly stated what the Supreme Court implied. In *Corniel-Rodriguez v. I.N.S.,*[42] the court reversed a deportation order of an alien who inadvertently violated the Immigration and Nationality Act because American consular officers had failed to provide her with certain crucial information. Petitioner received an

**35.** *See, United States v. Fox Lake State Bank,* 366 F.2d 962 (7th Cir.1966); *Semaan v. Mumford,* 335 F.2d 704 (D.C.Cir.1964); *Walsonavich v. United States,* 335 F.2d 96 (3d Cir.1964); *Simmons v. United States,* 308 F.2d 938 (5th Cir.1962).

**36.** *Schweiker v. Hansen,* 450 U.S. at 785, 101 S.Ct. 1468.

**37.** *Id.* at 788, 101 S.Ct. at 1471.

**38.** *See, Mendoza-Hernandez v. INS,* 664 F.2d 635, 639 (7th Cir.1981); *Yang v. INS,* 574 F.2d 171, 174–75 (3d Cir.1978); *Corniel-Rodriguez v. INS,* 532 F.2d 301, 306–07 (2d Cir.1976); *Santiago v. INS,* 526 F.2d 488, 491–93 (9th Cir.1975).

**39.** 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). This case involved a petition for citizenship brought by a native of the Phillipines who had served in the United States Army during World War II. The Nationality Act of 1940 provided that non-citizens such as Hibi, who had served in the armed services during World War II, could be naturalized without the usual requirements of residency and language proficiency. However, applicants were required to file naturalization petitions by December 31, 1946. Congress authorized the appointment of naturalization officers who travelled to various countries to assist such applicants. The immigration officer who was assigned to the Phillipines in 1945 was removed shortly thereafter. Hibi first arrived in the United States in 1964 and filed a petition for naturalization pursuant to the Naturalization Act of 1940. He argued that the government should be estopped from enforcing the December 31, 1946 deadline because of its failure to publicize his rights under the 1940 statute and its failure to station in the Phillipines a naturalization representative for the time such rights were available to him.

**40.** *Id.* at 8, 94 S.Ct. at 21.

**41.** *Schweiker v. Hansen,* 450 U.S. at 788–89, 101 S.Ct. at 1470–1471.

**42.** 532 F.2d at 306–07.

immigrant visa as the unmarried child of a United States resident, and the American consul failed to warn her that her visa would be automatically voided if she married before arriving in the United States. The official State Department regulations required the consular officer to provide this warning upon issuing the visa to petitioner. She married three days before she left her homeland, and the Immigration and Naturalization Service demanded her deportation after her arrival in the United States. The court found that the officer's failure to comply "with an affirmatively required procedure" was an act of affirmative misconduct.[43] The court estopped the government from deporting the alien and declared that it refused "to sanction a manifest injustice occasioned by the government's own failures."[44]

While *Corniel-Rodriguez* found affirmative misconduct in the failure to perform a regulation-mandated action, other decisions emphasized equitable considerations in applying estoppel when government employees engaged in conduct on which petitioners relied to their detriment. Thus, the Seventh Circuit estopped the federal government from bringing an action under the Civil False Claims Act against a bank that had relied upon the advice of federal agents in preparing certain disputed claims applications.[45]

The Ninth Circuit applied estoppel against the government although the representation relied upon was unauthorized.[46] The facts in that case involved the submission of a noncompetitive oil and gas lease bid to a regional Land Management office. The Land Manager rejected the bid because he interpreted an Interior Department decision as prohibiting the issuance of leases where the bid designates unequal interests as did the bid in *Brandt*. The Land Manager's decision provided that the applicants could resubmit their corrected bid without losing the priority of their original bid. The Secretary of the Interior later ruled that the Land Manager's statement concerning continuity of priority of the original bid was unauthorized and wrong. He awarded the lease to another applicant who submitted his bid before applicants had resubmitted their bids. In estopping the Secretary from disavowing the Land Manager's unauthorized statement, the court declared:

> Not every form of official misinformation will be considered sufficient to estop the government.... Yet some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement.[47]

The court concluded that "estoppel ... can properly be applied ... where the erroneous advice was in the form of a crucial misstatement in an official decision."[48]

## III.

The precepts and rationales of the aforementioned cases require this court to estop the government from recouping the reimbursements paid to CHS for expenses it incurred in employing CETA workers. The record shows that CHS was induced into submitting those expenses without offsetting the CETA grants by the affirmative instructions of the Secretary's agent, Travelers Insurance Companies. Not once, but on five separate occasions spanning over two years, Travelers advised CHS not to offset the CETA grants because they qualified as seed money exceptions to the offset requirements. Those instructions were affirmed by Travelers' approval of CHS' cost reports for those years.

It was reasonable for CHS to follow Travelers' instructions in this situation.

---

43. *Id.*

44. *Id.* at 307.

45. *United States v. Fox Lake State Bank,* 366 F.2d at 962.

46. *Brandt v. Hickel,* 427 F.2d 53, 56–57 (9th Cir.1970).

47. *Id.* at 56.

48. *Id.* at 57.

CHS acted reasonably because it was adhering to the administrative process mandated by Medicare. Consequently, CHS was harmed by diligently fulfilling its government-imposed duties within the Medicare system. Moreover, the source of the harm suffered by CHS is the intermediary's failure to pass on CHS' inquiry to the proper authority and its providing the answer itself. These conclusions are supported by the findings of the PRRB:

> [T]he Board would like to acknowledge the Provider's argument concerning the role of the fiscal intermediary. The Regulations succinctly state that 'an important role of the fiscal intermediary, in addition to claims processing and payment and other assigned responsibilities, is to furnish consultative services to providers in the development of accounting and cost-finding procedures which will assure equitable payment under the program' [42 CFR 405.401(e)]. However, it should be emphasized that the role of the intermediary is not to establish the principles of reimbursement. This is the responsibility of the Secretary. Although the Provider acted in good faith in not offsetting salaries and fringe benefits by CETA funds, advice by the Intermediary cannot be a substitute for the opinion of the Secretary.[49]

Thus, CHS acted in good faith; Travelers was not authorized to decide whether the CETA grants should have been offset; this decision should have been made by the Secretary.

In light of those findings, the PRRB, and the District Court in affirming the PRRB's decision, was clearly erroneous in concluding that CHS unreasonably relied upon Travelers' instructions and in attributing liability to CHS. To hold CHS liable would place it in an untenable position. Appellants' brief expresses the dilemma posed by the decisions below:

> Query, if a provider must obtain the opinion of the Secretary, what is the provider

supposed to do when the Intermediary fails to communicate a provider's request for that opinion? Is a provider supposed to circumvent the Secretary's mandated procedures? Further, what is the provider's remedy when the Intermediary acts in violation of the Intermediary's statutory requirement to serve as a channel of communications? Finally, how is a provider to know whether the information it is receiving is from the Intermediary or the Secretary?[50]

Appellants' argument then identifies the import of the District Court's decision:

> In view of these questions, if the District Court's construction of the reasonable reliance estoppel element is permitted to stand, it will drastically alter the reimbursement process under the Medicare Act contrary to Congressional intent. Under the District Court's construction, a provider subjects itself to substantial harm by dealing with an Intermediary at all. If the Intermediary decides to act without obtaining the Secretary's opinion, as Travelers did here, the Secretary can then avoid liability by simply disavowing any responsibility for information given to the detriment of the provider. This is precisely what the Secretary is attempting to do here. Thus, a provider has no reason to deal with an Intermediary. The risk is too great. The District Court's ruling may cause providers to abandon Intermediaries in favor of direct dealing with the Secretary to avoid this risk thereby defeating the statutory reimbursement procedures and mandating a larger government workforce at a time when substantial reductions are mandated.[51]

We find that Travelers' unauthorized and erroneous advice to CHS is analogous to that of the Land Manager in *Brandt v. Hickel, supra,* which the court in that case found to be "so closely connected to the basic fairness of the administrative decision making process that the government may

---

**49.** Joint Appendix at 93a.

**50.** Appellants' Brief at 26.

**51.** *Id.* at 26–27.

be estopped from disavowing the misstatement."[52]

Therefore, the intermediary's advice was not only erroneous, it constituted affirmative misconduct in relation to CHS. Reeves testified at the PRRB hearing that he knew of no official policy concerning the CETA grants at the time Wallach asked for guidance.[53] He also testified that the procedure intermediaries followed in getting answers to questions that are not covered in the administrative guidelines is to pass them on to the regional office of the Bureau of Health.[54] Although CHS fulfilled its administrative duties in presenting its question to Travelers, Travelers knowingly violated statutory and procedural guidelines in failing to communicate it to the proper authority within HHS from June 1975 to August 1977. Reeves deliberately chose instead to make that policy decision on his own. Reeves finally did forward CHS' inquiry to the Bureau of Health in August 1977. Had he done this in the first instance CHS would not have been misled. The harm to CHS was thus caused by the failure of the government's agent to perform a legally binding procedure.

It appears, therefore, that the intermediary's behavior in this case is similar to the consul officer's failure to comply "with an affirmatively required procedure" that the Second Circuit held constituted affirmative misconduct necessitating the application of estoppel against the government.[55] To impose liability on CHS for its good faith compliance with Medicare prescribed procedures and to allow the government to escape liability created by its agent's violation of those procedures would, in effect, repudiate the Medicare administrative process that was established by Congress.

This case is distinguishable, therefore, from five recent cases in which the Supreme Court found that the estoppel doctrine did *not* apply to the government.[56] Those cases provide no precedential support for the preclusion of the estoppel doctrine in this case.

In the earliest case, *Federal Crop Insurance Corp. v. Merrill, supra,* respondents brought an action to enforce a contract they entered into with a government agency, the Federal Crop Insurance Corporation, through its local agent to insure spring wheat that they were planting on winter wheat acreage. However, the Corporation's Wheat Crop Insurance Regulations clearly "precluded insurance coverage for spring wheat reseeded on winter wheat acreage."[57] The Court declared:

> not only do the Wheat Regulations limit the liability of the Government as if they had been enacted by Congress directly, but they were in fact incorporated by reference in the application, as specifically required by the Regulations.[58] [footnotes omitted]

The Supreme Court refused to enforce the contract and held the government liable on respondents' claim for crop damage due to drought. It held that "the Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance."[59]

---

52. *Brandt v. Hickel,* 427 F.2d at 56.

53. Transcript at 0197–0198.

54. Transcript at 0179. Travelers was obliged by statute and by its contract with the Secretary to "serve as a channel of communication from providers of services to the Secretary." 42 U.S.C. § 1395h(a)(2)(A) and Transcript at 0289.

55. *Corniel-Rodriguez v. INS,* 532 F.2d at 306–07.

56. *Immigration and Naturalization Service v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen, supra; INS v. Hibi, supra; Montana v. Kennedy, supra; Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

57. *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. at 386, 68 S.Ct. at 4.

58. *Id.* at 385, 68 S.Ct. at 3–4.

59. *Id.*

Perhaps the dividing line between the majority and the dissent in the instant case is our different readings of the *Merrill* case. We would not categorize the dissent's construction of that case as implausible, but we believe that the facts of *Merrill* are so different from those of this case that *Merrill* is not controlling and possibly irrelevant. With a closely divided court in *Merrill* the majority of five indicated that had the plaintiffs only gone to the basic documents—the regulations—they would have been able to ascertain the limited coverage under the Wheat Crop Insurance Regulations. In contrast to *Merrill,* in this case there is no "clear meaning of the regulation;" in fact there was no regulation in force at the time. Thus, there was no source to which CHS could have gone to ascertain whether the government agent's advice was wrong. This, we think, is the critical difference that makes *Merrill* inapplicable to the instant case.

In *INS v. Miranda, supra,* petitioner was a citizen of the Philippines who came to the United States and married a United States citizen after his temporary visitor's visa expired. He filed an application with the Immigration and Naturalization Service to adjust his status to that of a permanent resident alien. His wife, whose name is Milligan, simultaneously filed a petition requesting the INS to issue an immigrant visa to Miranda. The Court noted that, because § 245(a) of the Immigration and Naturalization Act conditions the granting of permanent resident status to an alien on the immediate availability of an immigrant visa, Milligan's petition would have satisfied this condition.

However, the INS failed to act on Miranda's petition and Milligan's application for eighteen months. During this time, Miranda and Milligan were divorced. Following the divorce Milligan withdrew her application. The INS thereafter denied Miranda's petition and ordered his deportation because he was no longer eligible for a permanent immigrant visa owing to his divorce.

Miranda appealed on the theory that the government should be estopped from deporting him because its failure to act on his petition and Milligan's application for eighteen months was so unreasonable, unfair and unjust that it was affirmative misconduct.

The Supreme Court rejected Miranda's appeal. It found that the INS' failure to process Milligan's application more promptly did not amount to affirmative misconduct. Its reason for this conclusion is that Miranda failed to present evidence to show that the eighteen months that INS used to investigate the validity of Miranda's marriage was unwarranted. Therefore, the evidence did not establish that the government failed to fulfill its duty.

Unlike *Miranda,* the government agent's misconduct in this case is clear. The duty imposed upon him by statute and by Medicare regulations was unambiguous; this duty was known to him; he failed to perform it.

In *Schweiker,* the Court in referring to Mr. Connelly, field representative of the Social Security Administration stressed that:

> at worst, Connelly's conduct did not cause respondent to take action, . . . or fail to take action, . . . that respondent could not correct at any time.[60]

Unlike *Schweiker,* the advice of the government agent in this case caused CHS to take action—to provide to the ill and to the poor more medical services than it otherwise would have because of the additional financial resources which CETA grants made possible if reimbursement of CETA grants was not required.[61] CHS failed to eliminate those additional human services because, over a period of two and a half years, it relied on the explicit assurances of the only authorized representative of the government with whom CHS was supposed to consult—Mr. Reeves of Travelers. Finally, this is an error that CHS "could not correct at any time." It is irremediable because

---

**60.** *Schweiker v. Hansen,* 450 U.S. at 789, 101 S.Ct. at 1471.

**61.** Transcript at 0146–0147.

the government is not simply requesting prospective changes; instead, it is pressing for the recoupment of funds that have already been spent and which are not otherwise available. The testimony in this case suggests that the "correction" could very well mean that CHS will close its doors or drastically reduce its services to ill and poor people if it is forced to repay the Secretary amounts equal to CETA grants CHS received. In fact, the trial judge, in granting the Temporary Restraining Order, held:

4. That CHS is a non-profit organization whose operation is dependent upon government funding and which has exhausted its borrowing capability and has no other source of funds with which to meet its payroll on August 15, 1978, other than the aforesaid funds due it from HEW;

5. That there is danger of immediate and irreparable injury being caused to plaintiff CHS, its employees and to the public which they serve, for the reason that the actions of the defendant Secretary will likely cause CHS to cease or severely curtail operations as a home health service agency, thereby threatening the health and lives of the individual plaintiffs and others similarly situated; [62]

In the earliest case, *Montana v. Kennedy, supra,* petitioner sought to estop the government from deporting him after residing in the United States for over fifty years. In resisting his deportation in 1958, petitioner argued, *inter alia,* that he was born outside of the United States because his mother had been prevented from leaving Italy prior to his birth by an American Consular Officer in Italy who mistakenly told his mother that she could not return to the United States in her pregnant condition and refused to issue her a passport while she was pregnant.[63] Petitioner asserted that the government should be estopped from deporting him "because of its own misconduct." [64]

The Court rejected petitioner's claim. It noted that the law was clear in 1906, and neither the United States nor Italy required an American passport to leave Italy and to travel to the United States. Since petitioner's mother was permitted by United States and Italian law to leave Italy, the Supreme Court characterized the consular officer's statement as merely "well meant advice" that a pregnant woman "cannot [return to the United States] in that condition." [65] Consequently, the court held that the advice fell "far short of misconduct." [66] Petitioner's mother could have ascertained her legal rights by independent inquiry. Unlike *Montana,* appellant CHS in the case before us had no alternative means of ascertaining the status of CETA grants. No regulation, congressional directive or administrative guideline existed that determined whether or not CETA grants should be offset against Medicare reimbursements. Therefore, we find that the erroneous advice that was given to CHS by the *only* governmental source of information available to it is affirmative misconduct under the unique circumstances of this case.

Finally, in *INS v. Hibi, supra,* estoppel was denied because the Court did

not think that the failure to fully publicize the rights which Congress accorded under the Act of 1940, or the failure to have stationed in the Phillipine Islands during all of the time those rights were available an authorized naturalization representative, can give rise to an estoppel against the government.[67]

In contrast to *Hibi, supra,* the governmental officer authorized by the statute to assist petitioner in the instant case to ascertain its rights was available; petitioner consulted him; and the officer gave erroneous advice on which petitioner relied to its great financial detriment. Moreover, the

---

62. Joint Appendix at 70a.

63. *Montana v. Kennedy,* 366 U.S. at 314, 81 S.Ct. at 1340.

64. *Id.*

65. *Id.*

66. *Id.*

67. 414 U.S. at 8–9, 94 S.Ct. at 21–22.

government conduct in *Hibi* was in the nature of an omission. Here, the governmental conduct was a clear act of commission which, on the facts of this case, rises to the level of affirmative misconduct.

## IV.

The Court wishes to emphasize the injustice to CHS and the people it serves if it is required to refund the alleged overpayments. The extra monies were used to expand CHS' services to meet serious human needs. This case, therefore, is distinguishable from others that involve possible overtones of fraud or profiteering by submitting to Medicare inflated cost reports for unnecessary services. No one questions the reasonableness of the amounts paid to, or the necessity of employing CETA workers. The only people who profited were the weak, the lame and the ill who comprised CHS' impoverished and medically underserved beneficiaries. They would be the persons injured if CHS were required to repay the funds in question. In granting CHS' motion for a Temporary Restraining Order, the District Court recognized this harm when it asserted that recoupment of the CETA funds "will likely cause CHS to cease or severely curtail operations as a home health service agency, thereby threatening the health and lives of the individual plaintiffs and others similarly situated." [68] This Court, like the Second Circuit, refuses to sanction such a manifest injustice occasioned by the Government's own misconduct.[69]

With all due respect, we submit that the dissenting opinion is quite wide of the judicial mark in at least two respects. First, it alleges that we have been "snared by the trap" of "emotion and ideology" because we "approve . . . the social program involved" and that we would not have "countenanced governmental estoppel" if we were merely dealing with "a defense contractor" claiming to retain seven million dollars. Dissenting opinion at 628, n. 1. Candidly, we believe that under our system of law all litigants are entitled to equal justice—whether wealthy or poor, whether defense contractors or non-profit health agencies, whether stockholders or medicare patients. Necessarily, when determining the issue of detrimental reliance we had to discuss the facts—thus the plight of the Community Health Services, their economic injury, their reliance and the impact of the government's misrepresentation on both CHS and the ill persons whom they serve. The dissent, therefore, is simply incorrect in asserting that this decision is an unprincipled expression of "emotion and ideology." Whether it is a defense contractor or an eleemosynary institution is not critical. Our adjudication is predicated on our finding of the affirmative misconduct of the government's agent; the petitioner's injury and the petitioner's reasonable reliance upon the government's agent's advice.

Secondly, the dissenting opinion is based upon a novel, but erroneous statement of the law of governmental estoppel. The dissent asserts that the petitioner must qualify for a substantive entitlement before governmental estoppel lies. *None* of the cases cited by the dissent embrace this theory; none of these decisions turn on the fact that petitioner had, or did not have, a substantive entitlement. In none of the cases has the Supreme Court used the term "substantive entitlement," nor has the Supreme Court uttered the theory of the dissent under any other label. Nor are we aware of any cases in which substantive entitlement was a controlling factor. The dissent, therefore, errs in emphasizing substantive entitlement rather than the nature of the government agent's conduct and the petitioner's reasonable and detrimental reliance upon that conduct.

Indeed, the Supreme Court's decision in *Schweiker, supra,* as the decision here, turned on the nature of the government employees' conduct and whether the petitioner demonstrated reasonable, detrimental reliance. In *Miranda, supra,* the Su-

---

**68.** Joint Appendix at 70a.

**69.** *Corniel-Rodriguez v. I.N.S.,* 532 F.2d at 307.

preme Court explicitly refused to apply estoppel against the government precisely because the governmental action fell "far short of" [70] affirmative misconduct. The decision the dissent identifies as controlling precedent in this case, *Federal Crop Insurance Corporation v. Merrill, supra,* actually turned on the reasonableness of respondents' reliance on the government agent's advice, not on whether they had a substantive entitlement to the insurance. The Court decided against respondents because it held them responsible for knowing that the Corporation's regulations precluded the insurance coverage for which they had applied. In all these cases, the question of whether petitioner had a substantive entitlement was not germane.

Moreover, this case does not present a question of substantive entitlement. We do not have to determine, and we do not decide, if petitioner would be entitled to the funds in question if the government could not be estopped from recouping them. This case presents instead a question of detrimental reliance upon the affirmative misconduct of a government agent. Whether or not CHS is otherwise entitled to the monies is not relevant. CHS expended monies because of and in reasonable reliance upon, an illegally made and erroneously founded decision of a representative of the government. Therefore, the government should not now be allowed to reclaim those monies.

## CONCLUSION

We hold that the District Court erred in concluding that equitable estoppel does not lie against the Secretary of Health and Human Services on the facts of this case. We therefore will reverse the judgment of the district court which granted appellee's motion for a summary judgment and remand these proceedings to the district court with the direction that it grant appellants' petition to estop the Secretary from recouping the alleged overpayment.

MEANOR, District Judge, dissenting.

Part I of the majority opinion quite adequately sets forth the facts and I need not repeat them. I cannot, however, accept the majority's conclusion that the government is estopped from claiming reimbursement for the overpayment made here. I recognize that this case has sympathetic overtones.[1] However, if there is any basis for estopping the government—an action that the Supreme Court has never expressly taken [2]—this case does not provide it.

It is true that, particularly in the last decade, the federal judiciary has increasingly applied estoppel against the govern-

---

**70.** *INS v. Miranda,* —— U.S. at ——, 103 S.Ct. at 281–282.

**1.** In *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Supreme Court recognized that it was dealing with a case which involved sympathetic overtones. Indeed, the Court stated that "[t]he case no doubt presents phases of hardship." *Id.* at 383, 68 S.Ct. at 2. Nevertheless, the Court was not moved by this factor, and held that the government should not be estopped. *Id.* at 386, 68 S.Ct. at 4. I believe that the majority in the instant case has been snared by the trap which the Court in *Merrill* managed to avoid. The majority has allowed emotion and ideology to enter into its decision. I am convinced that if this case involved a defense contractor who worked on a cost plus basis, and who claimed a right to retain seven million dollars, as opposed to the seventy thousand dollars involved in the instant case, the majority would never counte-

nance government estoppel. In short, I believe that the majority was influenced by the fact that it approves the social program involved. This sort of reasoning results in ad hoc decision-making which more appropriately is left to Congress.

**2.** The issue of government estoppel has arisen in six Supreme Court cases: *Immigration & Naturalization Serv. v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *United States Immigration & Naturalization Serv. v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961); *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In none of these cases has the Supreme Court *expressly* estopped the government.

ment.[3] I do not believe, however, that the government may be estopped where the estoppel would render to the opponent a benefit to which he was never substantively entitled. It may be that a valid estoppel can lie where affirmative government misconduct[4] induces a procedural default, thus depriving one of a substantive entitlement.[5] It may also be that the doctrine of estoppel properly can be used where affirmative government misconduct induces action which thereafter prevents one from qualifying for a substantive entitlement.[6] But I do not believe the government can be estopped where the result would be to give a benefit to which there never was any entitlement.

For me, *Federal Crop Insurance Corp. v. Merrill*[7] is controlling. Respondents there applied to the petitioner federal agency for crop insurance on 460 acres of spring wheat, 400 acres of which was to be reseeded winter wheat. Respondents were advised that the entire crop was insurable and the insurance was issued. The entire crop was later destroyed by drought, and respondents learned that valid regulations precluded crop insurance for reseeded wheat. In refusing to estop the government from denying liability the Supreme Court stated:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.[8]

The Court further stated that the limitation on insurance coverage was pursuant to valid regulations, and that all persons are charged with knowledge of rules and regulations in the Federal Register.[9]

---

**3.** *E.g., Corniel-Rodriguez v. Immigration & Naturalization Serv.,* 532 F.2d 301 (2d Cir.1976); *Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970); *Walsonavich v. United States,* 335 F.2d 96 (3d Cir.1964).

**4.** It is not altogether clear whether affirmative misconduct is required to estop the government, or whether mere negligence will suffice. In *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), discussed in text *infra,* the Court upheld a grant of United States citizenship where the foreign citizen was not warned by the United States that by claiming military exemption he would lose his right to become a citizen. Thus, the government's negligence in failing to warn the foreign citizen prevented the government from denying the person citizenship. Although the Court disclaimed reliance upon an estoppel theory, many believe this to be an estoppel case. *See infra* note 10. Similarly, in *Corniel-Rodriguez v. Immigration & Naturalization Serv.,* 532 F.2d 301 (2d Cir.1976), the government's failure to warn was held sufficient to estop the government. Contrary to the majority's reading of subsequent Supreme Court cases, *see* majority opinion at 621, I believe that these cases indicate that something more than mere negligence is required before affirmative misconduct will be found. *E.g., Schweiker v. Hansen,* 450 U.S. 785, 788–89, 101 S.Ct. 1468, 1470–1471, 67 L.Ed.2d 685 (1981) ("we are convinced that Connelly's conduct—which the majority con-

ceded to be less than 'affirmative misconduct,'. . .—does not justify the abnegation of that duty"); *United States Immigration & Naturalization Serv. v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) ("While the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy,*. . .no conduct of the sort there adverted to was involved here"); *Montana v. Kennedy,* 366 U.S. 308, 314–15, 81 S.Ct. 1336, 1340–1341, 6 L.Ed.2d 313 (1961). *See Oki v. Immigration & Naturalization Serv.,* 598 F.2d 1160, 1162 (9th Cir.1979).

**5.** *E.g., Miranda v. Immigration & Naturalization Serv.,* 638 F.2d 83 (9th Cir.1981) (United States citizenship jeopardized because petitioner married before entering country).

**6.** *E.g., Walsonavich v. United States,* 335 F.2d 96 (3d Cir.1964) (taxpayer lured into not filing refund claim and claim subsequently barred by statute of limitations).

**7.** 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

**8.** *Id.* at 384, 68 S.Ct. at 3.

**9.** Subsequent cases, however, seem to hold that persons are not held to have knowledge of all statutes and regulations. *See, e.g., Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95

The facts of *Merrill* parallel those here. In both cases erroneous representations were made by government agents; in both cases there was reliance; and in both cases damage was incurred because of that reliance. Finally, in both cases there never was any entitlement to secure a benefit from the government. The only difference between *Merrill* and this case is that here the plaintiffs have received the funds in dispute, whereas in *Merrill* the insurance proceeds never were paid. I can think of no way in which this factual difference can lead to a principled distinction. It is also important to note that in *Merrill* the Court noted "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." [10]

The Supreme Court has never, except perhaps in one instance, countenanced the use of estoppel against the government. *Moser v. United States* [11] may be analyzed as a case in which an estoppel was applied against the government, although the Court did not rely on the doctrine. Moser, a Swiss citizen residing in the United States, applied during World War II for exemption from military service pursuant to a treaty between the United States and Switzerland. By statute it was provided that a claim of exemption from military service prevented such a claimant from becoming a citizen of the United States. The usual form on which such an exemption was claimed stated explicitly that the claim would bar the claimant from obtaining citizenship. The Swiss legation, however, took the position that such a bar from citizenship was inconsistent with the rights under the treaty. The State Department, together with Selective Service Headquarters and the Swiss legation, worked out a revised form which omitted reference to debarment from citizenship. Moser, who had claimed the exemption, was later granted citizenship after the district court explicitly found that, had he known his claim of exemption from military service would debar him from citizenship, he would have elected to serve in the armed forces of the United States. The Supreme Court upheld the grant of citizenship on the ground that Moser had not made an intelligent waiver of his right to obtain citizenship. The Court, however, expressly disclaimed reliance on an estoppel theory. Nevertheless, many courts and commentators believe that the *Moser* Court was in reality applying estoppel principles. [12] I believe the result in *Moser* to be correct, regardless of whether a waiver or estoppel theory is relied upon. In *Moser,* the Swiss citizen could easily have become an American citizen had he not claimed the exemption. Thus, the government misconduct induced action on the part of the Swiss citizen which prevented him from qualifying for a substantive entitlement. In this respect, *Moser* differs from *Federal Crop Insurance* in that the respondent in the latter case had no substantive entitlement and was not deprived of qualifying for one.

One recent case is particularly instructive in analyzing the issue of government estoppel. In *Hansen v. Harris,* [13] the claimant became eligible for social security benefits in June of 1974. The claimant failed to file a written application, however, because a Social Security Field Representative supplied her with misinformation, and did not urge her to file a written claim. The Court of Appeals for the Second Circuit held that the government was estopped from denying benefits in view of the government's misconduct. The court began its analysis with the proposition that "[t]he Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents." [14]

---

L.Ed. 729 (1951); *Corniel-Rodriguez v. Immigration & Naturalization Serv.,* 532 F.2d 301 (2d Cir.1976).

10. 332 U.S. at 385, 68 S.Ct. at 3.

11. 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951).

12. *E.g., Air-Sea Brokers, Inc. v. United States,* 596 F.2d 1008, 1011 (C.C.P.A.1979); K. Davis, Administrative Law Text 345 (3d ed. 1972).

13. 619 F.2d 942 (2d Cir.1980), *rev'd, Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

14. *Id.* at 947.

The court went on to distinguish between procedural requirements and substantive eligibility for the program in question. Thus, the question becomes whether "[i]t would fulfill the fundamental legislative goal to grant appellee the benefits she seeks." [15] Because the appellee was found to be substantively entitled to the benefits, the court of appeals held the government estopped from denying benefits. The court limited its holding to cases where "(a) procedural not a substantive requirement is involved and (b) an internal procedural manual or guide or some other source of objective standards of conduct exists and supports an inference of misconduct by a Government employee." [16] In his dissenting opinion, Judge Friendly indicated that *Federal Crop Insurance* mandated a holding that the federal government can *rarely* be estopped. Judge Friendly stated that to estop the government means that the door to the federal fisc is held wide open, and that government agents will have to follow every regulation to the last detail. As for the substance/procedure distinction, Judge Friendly found the argument to be hollow. Judge Friendly believed that all conditions on receiving benefits are substantive "in the sense that . . . they significantly affect the result, not 'merely the manner or means by which a right to recover . . . is enforced.' " [17]

In *Schweiker v. Hansen*,[18] the Supreme Court reversed the court of appeals in a per curiam opinion. The Court began its opinion by stating that it agreed with Judge Friendly, who, it must be remembered, stated that the government should rarely be estopped. The Court stressed " 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.' " [19] The Court found that the government agent's failure to comply with the Claims Manual by not recommending

that the claimant file a written application did not constitute affirmative misconduct. As for the substance/procedure distinction, the Court stated:

Finally, the majority's distinction between respondent's "substantiv[e] eligib[ility]" and her failure to satisfy a "procedural requirement" does not justify estopping petitioner in this case. Congress expressly provided in the Act that only one who "has filed application" for benefits may receive them, and it delegated to petitioner the task of providing by regulation the requisite manner of application. A court is no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits.[20]

It is important to note that the Court did not reject the substance/procedure distinction. The Court merely stated that under the facts of this case, the substance/procedure distinction did not warrant estopping the government. The claimant, however, could be said to have had a substantive entitlement to benefits in 1974. The claimant was deprived of those benefits because of the misrepresentations of the government. What the Supreme Court seems to be saying, however, is that the requirement that the application be written is substantive, not procedural, and that the claimant had no substantive entitlement because a written application was never filed. This was the position adopted by Judge Friendly. As far as the instant case is concerned, however, the Supreme Court opinion supports my analysis. The *Hansen* opinion in no way casts doubt upon my theory that where there is no substantive entitlement, the government cannot be estopped. Indeed, in *Hansen,* the Court found no substantive entitlement, and therefore did not

15. *Id.* at 948.

16. *Id.* at 949.

17. *Id.* at 957 (Friendly, J., dissenting) (quoting *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945)).

18. 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

19. *Id.* at 788, 101 S.Ct. at 1470 (quoting *Federal Crop Insurance,* 332 U.S. at 385, 68 S.Ct. at 3–4).

20. *Id.* 450 U.S. at 790, 101 S.Ct. at 1471–1472.

estop the government. What the *Hansen* Court in reality does is to define when there is a substantive entitlement. I stated earlier that a valid estoppel *may* lie where affirmative government misconduct induces a procedural default, thus depriving one of a substantive entitlement, or where affirmative government misconduct induces action which thereafter prevents one from qualifying for a substantive entitlement. The *Hansen* opinion casts doubt upon whether procedural defaults can be the basis of governmental estoppel where the default was caused by government misrepresentations. *Hansen* seems to indicate that such defaults act to deprive the claimant of any substantive entitlement. In any case, resolution of this issue must await another day. In the instant case there can be no doubt that the appellant never had any substantive entitlement. Under *Federal Crop Insurance* and *Hansen,* I believe that the government clearly cannot be estopped.

The issue of government estoppel has been considered by numerous courts of appeal. The majority relies heavily upon two cases in particular. In *Corniel-Rodriguez v. Immigration & Naturalization Service,*[21] the petitioner applied for a special immigrant visa, and the United States consulate in Santo Domingo issued such a visa on August 17, 1967. Once in the United States, deportation proceedings were commenced, however, because petitioner had been married three days before her departure from the Dominican Republic. A provision of the Immigration and Nationality Act provides that the exemption for children of special immigrants[22] is unavailable if the alien is married at the time of application for the visa or at the time of admission into the United States.[23] A valid regulation states: "The consular officer shall warn an alien [issued a visa as a child], when appropriate, that he will be inadmissible as such an immigrant if he is not unmarried at the time of application for admission."[24] Contrary to this regulation, the United States consulate did not advise petitioner of the consequences of marriage before entry into the country. So as to avoid a "manifest injustice," the Court of Appeals for the Second Circuit estopped the government from deporting the petitioner.

In *Brandt v. Hickel,*[25] appellants submitted a non-competitive oil and gas lease offer to the Los Angeles office of the Bureau of Land Management. Because the issuance of leases is prohibited where the offer form designates unequal interests, the offer was rejected. Appellants were given the right to substitute within thirty days new order forms eliminating any reference to unequal interests without losing their priority. Because of this promise, appellants did not appeal the decision of the Bureau of Land Management. In reality, the promise that appellants would not lose their priority was not authorized by statute or regulation. The court of appeals held that the "crucial misstatement" in the official decision of the Bureau of Land Management was sufficient to estop the government. Thus, appellants were granted a right to appeal from the land office decision, and were thereby entitled to attempt to preserve their priority.

In discussing the above cases, the majority concentrates on the fact that there was affirmative misconduct and that equitable considerations mandated estopping the government. The majority, however, fails to acknowledge that in both these cases the appellants had a substantive entitlement.[26] In *Corniel-Rodriguez,* the petitioner had a right to become an American citizen. Petitioner was deprived of this right by the government's failure to warn as to the consequences of marriage before entry into the country. In *Brandt,* appellants had a right to appeal the decision of the Bureau of Land Management. This right was lost, however, because of affirmative misrepre-

**21.** 532 F.2d 301 (2d Cir.1976).

**22.** 8 U.S.C. § 1182(a)(14)(1976).

**23.** *See id.* § 1101(b)(1).

**24.** 22 C.F.R. § 42.122(d) (modified in 1965).

**25.** 427 F.2d 53 (9th Cir.1970).

**26.** Even under the *Hansen* definition of "entitlement," it is clear that appellants had substantive entitlements.

sentation on the part of the government. The majority states: "We find that Travelers' authorized and erroneous advice to CHS is analogous to that of the Land Manager in *Brandt v. Hickel, supra,* which the court in that case found to be "so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement." [27] Fairness may have dictated that the government be estopped in *Brandt.* Fairness does not dictate that the government be estopped where, as in the instant case, the appellant never had any substantive entitlement to the benefits. Where no substantive entitlement exists, to estop the government amounts to no more than a court authorized raid on the public treasury. Thus, the cases relied upon by the majority provide no support for the notion that the government should be estopped where no substantive entitlement exists. It is true that there are some cases where the courts have estopped the government even though no substantive entitlement existed.[28] In my opinion, courts which have so held are simply wrong.

As stated earlier, I believe that the outcome in this case is controlled by *Federal Crop Insurance.* It seems to me that *Federal Crop Insurance* was recently reaffirmed by the Supreme Court in *Schweiker v. Hansen.* In *Hansen,* the Court expressly agreed with the position taken by Judge Friendly in his dissenting opinion in the court of appeals. In his dissent, Judge Friendly adhered strictly to the precepts of *Federal Crop Insurance.* Indeed, Judge Friendly was of the opinion that the government should rarely be estopped. Although the Court in *Hansen* approved Judge Friendly's position, it is doubtful whether it meant to go as far as to say that

the government can never be estopped, in view of the fact that the *Hansen* Court went on to find that no affirmative misconduct was involved.[29] Nevertheless, *Hansen* indicates that the Supreme Court views government estoppel with disfavor, and certainly provides no support for the majority opinion. Appellant in the instant case had no substantive entitlement, and thus under *Federal Crop Insurance* and *Hansen* the government cannot be estopped.

For the foregoing reasons, I respectfully dissent.[30]

---

**27.** Majority opinion at 623.

**28.** *E.g., United States v. Lazy FC Ranch,* 481 F.2d 985 (9th Cir.1973); *Dana Corp. v. United States,* 470 F.2d 1032 (Ct.Cl.1972); *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir.1970); *Schuster v. Commissioner of Internal Revenue,* 312 F.2d 311 (9th Cir.1962).

**29.** Indeed, since *Hansen* at least one court of appeals has held the government estopped.

*E.g., Miranda v. Immigration & Naturalization Serv.,* 673 F.2d 1105 (9th Cir.), *rev'd,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (no affirmative misconduct).

**30.** Appellants advance additional arguments in support of reversal. Since the majority does not reach them, I see no necessity for a discussion of them in dissent.